

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,247

**JIMMIE URBANO LUCERO, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL
FROM CAUSE NO. 48593-C FROM THE 251ST DISTRICT COURT
POTTER COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined. PRICE and JOHNSON, JJ., concurred.

### O P I N I O N

Appellant was convicted on May 23, 2005, of murdering three of his neighbors during the

same criminal transaction. TEX. PEN. CODE ANN., §19.03(a)(7)(A).[1] Pursuant to the jury's answers

---

[1]On the morning of September 6, 2003, the 45-year-old appellant entered his neighbor's property and murdered three members of the Robledo family with a shotgun. Pedro Robledo, his wife, Manuela Robledo, and their daughter Fabiana Robledo were murdered. Appellant also attempted to murder the Robledo's other two children, Socorro and Guadalupe Robledo, who both testified at trial. Socorro testified that he escaped on foot without injury, and Guadalupe testified that appellant cornered her, Fabiana, and Fabiana's 18-month old son in a bedroom. Appellant shot

(continued...)

to the special issues set forth in TEX. CODE CRIM. PROC., Article 37.071, §§2(b) and 2(e), the trial judge sentenced appellant to death. Finding no merit in any of the seven points of error raised by appellant in this direct appeal, we affirm.

Points of error one and two relate to a juror misconduct claim that appellant raised in a motion for new trial. Appellant asserts in point of error one that the trial court erred in denying him a hearing on his juror misconduct claim.[2] He asserts in point of error two that the jury committed misconduct under the United States Constitution when it considered Biblical scripture during the punishment-phase deliberations.[3]

The record reflects that appellant filed new trial motions (an original and an amended motion for new trial). These motions alleged that the jury foreman read Biblical scripture to the jury at the beginning of the punishment-phase deliberations after an initial straw vote showing that two jurors were unwilling to answer the special issues in a way that required appellant to be sentenced to death. These motions alleged:

> After retiring to deliberate on the issue of punishment, the jury foreman conducted an initial straw vote on both of the statutorily mandated special issues which addressed the probability that Defendant would commit criminal acts of violence in the future so as to constitute a continuing threat to society (special issue number 1) and whether there existed sufficient mitigating circumstances to warrant that a

---

[1](...continued)
Guadalupe in the arm and murdered Fabiana after pulling her son from her arms.

[2]**Point of error one:** Did the trial court abuse its discretion and commit reversible error in denying appellant an evidentiary hearing on the issue of scripture reading by the jury foreman during punishment deliberations?

[3]**Point of error two:** Was appellant denied his rights to an impartial jury and punishment determination in violation of the Sixth, Eighth, and Fourteenth Amendments to the Unites States Constitution when jurors considered Biblical scripture during its deliberations at the punishment phase of appellant's trial and before it rendered its final verdict?

sentence of life imprisonment rather than a death sentence be imposed (special issue number 2). This initial vote revealed a majority of ten jurors who were prepared to vote "yes" to special issue number 1 and "no" to special issue number 2, thus necessitating the imposition of the death penalty. The remaining two jurors indicated their unwillingness to vote in such a way in which the death penalty would be imposed. At this juncture, the jury foreman produced his personal Bible and read to all members of the jury scripture from the Bible. This scripture addressed a Christian's duty to obey and consent to the laws of man.[4] It also informed the listeners that those who opposed authority would experience condemnation.[5]

The content of this scripture had the desired effect of coercing the two dissenting jurors to change their votes in order to insure a unanimous tally on both special issues. Thus, the receipt of the biblical scripture by the jury infringed on each individual juror's duty to base their verdict only on evidence received at trial. This receipt of other evidence was detrimental to Defendant's constitutional guarantee that the verdict at the punishment phase of the trial be truly unanimous, free from coercion and the product of the juror's individualized assessment of evidence lawfully admitted into during (sic) the punishment phase of the trial.

---

[4]The record reflects that the jury foreman read Romans 13:1-6, from the New Testament of the New International Version of the Bible. Romans 13:1-6, provides:

> [1]Everyone must submit himself to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God. [2]Consequently, he who rebels against the authority is rebelling against what God has instituted, and those who do so will bring judgment on themselves. [3]For rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear of the one in authority? Then do what is right and he will commend you. [4]For he is God's servant to do you good. But if you do wrong, be afraid, for he does not bear the sword for nothing. He is God's servant, an agent of wrath to bring punishment on the wrongdoer. [5]Therefore, it is necessary to submit to the authorities, not only because of possible punishment but also because of conscience. [6]This is also why you pay taxes, for the authorities are God's servants, who give their full time to governing.

[5]Appellant claims on appeal that the Biblical scripture read by the foreman "had to do with a Christian's duty and responsibility to carry out the dictates of secular law" which "includes society's and this state's validation of the legality of capital punishment." He further asserts that:

> [T]his extra-judicial code of law requires a mortal's submission to civil law and that includes the imposition of capital punishment. In this regard, reference to Romans 13:1-6 carries with it a high potential of influencing a jury's deliberations on the issue of life or death.

Appellant supported these allegations with an affidavit from one of the jurors (juror No. 7). This affidavit states:

> I served as a juror in the case styled *The State of Texas v. Jimmie Urban Lucero* in the 251ˢᵗ District Court in Potter County, Texas. During jury deliberations at the punishment phase of the trial, I recall that the jury foreman suggested that we take a "straw vote" or a preliminary vote on the two special issues to see where we, as the jury were. The initial vote on both special issues showed 10 jurors were in favor of answering the questions in a way in which the death penalty would be imposed. The remaining two jurors were unwilling to answer those questions in a way in which the death penalty would be imposed. It was at this point in time that the jury foreman took out a Bible which he had with him. He read some scripture from the Bible. This scripture had to do with a Christian's duty to obey, conform and consent to the will and laws of man. This reading of scripture occurred before the final votes were taken by the jury on the two special issues regarding the probability that the Defendant would commit criminal acts of violence in the future and the sufficiency of mitigating evidence which would justify a life sentence in place of the death penalty. Although there was not a unanimous vote by the jury as a whole on the two special issues before the reading of the scripture, the vote was unanimous on both special issues some time after the reading of scripture. The foreman of the jury then informed the bailiff and the Court that we had reached a unanimous verdict which called for the death penalty against Jimmie Lucero.

Appellant claimed that the Bible reading by the jury foreman was an improper "outside influence" under TEX. R. EVID. 606(b), which generally prohibits a juror from testifying about jury deliberations for the purpose of impeaching the jury's verdict with an exception to this general rule being that a juror may testify "whether any outside influence was improperly brought to bear upon any juror."[6] Appellant further claimed that it was mandatory for the trial court to hold a hearing on

---

[6]Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.

(continued...)

his new trial motions so that appellant could "develop the circumstances of the Bible reading and the exact content of the biblical verse read by the foreman to the entire jury."

Appellant also claimed in his new trial motions that he was entitled to a hearing on these motions because "key jurors refuse[d] to discuss the matter with counsel or with any representative of counsel." He further claimed that "[o]nly through compulsory process and sworn testimony from key jurors at a hearing can all relevant facts be developed for this Court's ultimate determination of the merits underlying Defendant's motion." Appellant's counsel filed an affidavit in support of these allegations. The affidavit indicates that only three jurors (Nos. 1, 8, and 12) declined to discuss the case with appellant's counsel. It also specifically states counsel did discuss the case with jurors numbered 2, 3, 4, 5, 6, 7, and 11. No mention is made of juror No. 9 or No. 10. Thus, it appears nine out of twelve jurors did discuss the case with appellant's counsel before he filed his new trial motions supported only by juror No. 7's affidavit.

Relying primarily on civil cases, the State's response asserted that the Bible reading was not an "outside influence" and that appellant was, therefore, improperly attempting to impeach the jury's verdict under Rule 606(b). *See, Golden Eagle Archery Inc. v. Jackson*, 24 S.W.3d 362, 366-75 (Tex. 2000) (rules contemplate that an "outside influence" originates from sources other than the jurors themselves); *Brandt v. Surber,* 194 S.W. 3d 108, 134 (Tex.App.–Corpus Christi 2006, pet. denied) (a jury's discussion of newspaper articles is not an "outside influence"); *Easly v. State,* 163 S.W.3d 839, 842 (Tex.App.–Dallas 2005, no pet.) (a chart brought into jury room with calculations of time

---

[6](...continued)
However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

appellant would serve in prison after application of the parol laws is not an "outside influence");

*Perry v. Safeco Ins. Co.,* 821 S.W.2d 279, 281 (Tex.App.–Houston [1ˢᵗ Dist.] 1991, writ denied)

(juror using dictionary to share a definition with other jurors is not an "outside influence").

It is also imperative to note that the State submitted affidavits from all twelve jurors, all of which indicated that the verdict was not affected by the brief reading of Biblical scripture near the beginning of the hours-long jury deliberations. The two jurors who changed their votes after the preliminary vote unequivocally stated that the reading of the scripture and its content had no effect on their votes on the issues presented to the jury. Juror No. 3 stated:

> When the first vote was taken, I was not ready to vote because I was overwhelmed and too emotional. As a result, I initially voted in a way that a life sentence rather than the death sentence was imposed. The case was difficult for me, among other reasons, at least because, I, like the defendant, came from a large family, had a brother about the same age of the defendant, and the defendant's mother was near the age of my mother. I wanted to take time, discuss the evidence, think about the trial, and feel clear about my decision . . .
> After going back into the jury deliberation room during the punishment stage, I recall the juror foreperson read some scripture, saying that he was comforted by the scripture. The foreman said that we may or may not find comfort in the scripture. I do not recall the Chapter and verse of the scripture read. The scripture was not read in a way to force us to agree with it. The jury was not asked to agree with the scripture that was read or to change our decisions based upon its reading . . .
> The reading of the Bible and the comfort comment probably took less than 2 and ½ minutes out of several hours of deliberations discussing the charged law and the facts. No other scripture was read or discussed . . .
> I do not believe that the reading of the scripture violated the principles of justice. In my opinion, the reading of the scripture did not violate any right of the defendant. The scripture reading was not utilized in a way to bring prejudice against the defendant. Moreover, in the overall scheme of about a two week trial and several hours of deliberations, the above Bible reading was not related to the verdict returned to the court.

The second of the two jurors to change their vote stated:

> When the first vote was taken, I did not vote in a way in which the death penalty was to be assessed. The negative vote was on the first of the two questions

the jury had to answer regarding a continuing threat to society. So, I initially voted in a way that a life sentence rather than the death sentence was imposed. After going back into the jury deliberation room during the punishment deliberations and after the first vote, the jury foreperson read some Bible verses. The scripture was not read in a way to force us to agree with it. The jury was not asked to agree with the scripture that was read or to change our decisions based upon its reading or content. I did not feel I was going to be condemned if I did not vote for a particular verdict or answer a question in a particular way . . . . I am today comfortable with my votes and individual decision I made during my service on this jury. We followed the court's instructions.

The reading of the Bible took probably less than 2 minutes out of several hours of deliberations discussing the charged law and facts . . . . There was no suggestion that the Bible should be consulted on factual issues as opposed to the evidence presented at the trial . . . . In my opinion, based upon the discussions during jury deliberations, our decision was based upon the evidence presented during the course of the trial from the witness stand not on the reading of the scripture. My individual guilt and punishment determinations were based upon the law and evidence presented at trial not the Bible.

All twelve jurors believed that the scripture reading did not violate any right of the defendant and that the defendant received a fair and impartial trial. The juror who read the scripture to the other jurors stated:

The reading of this scripture was not an attempt on my part to convince any juror to vote in a way that would result in the death penalty. I wanted to read scripture because of the seriousness of the decision at hand and to suggest that the man's law as charged in the judge's instructions should be followed. There was no suggestion that the Bible had the answer on the questions regarding whether a life sentence or a death sentence should be imposed. There was no suggestion that the Bible should be consulted as the legal authority contradicting the law of the court's instructions. There was no suggestion that the Bible should be consulted on factual issues as opposed to the evidence presented at the trial.

All twelve jurors indicated that there was no discussion that Biblical principles should be considered or applied in defendant's case. More specifically, Juror No. 7 addressed any misconception that may have been construed from the affidavit previously obtained by appellant's counsel:

The reading of the Bible and any accompanying comment probably took less than 3 minutes out of several hours of deliberations discussing the charged law and

the facts. No other scripture was read or discussed. There was no passage read suggesting that a murderer should be executed under Biblical law. There was no Bible passage read about the principal of a limb for a limb or an eye for an eye or tooth for a tooth. There was no discussion that such a Biblical principle should be considered or applied in this case to the Defendant, Jimmie Urbano Lucero.

There was no suggestion that the scripture reading was to convince any juror to vote in a way that would result in the death penalty. I do not believe that the reading of the scripture was meant to sway votes one way or the other. There was no suggestion that the Bible had the answer on the questions regarding whether a life sentence or a death sentence should be imposed. There was no suggestion that the Bible should be consulted on factual issues as opposed to the evidence presented at the trial. To my knowledge, the reading of the scripture did not cause anyone to change their vote or to vote in a way that would have resulted in a death penalty being imposed. In my opinion, based upon the discussions during jury deliberations, our decision was based upon the evidence presented during the course of the trial from the witness stand not on the reading of the scripture. From my observations, I think each member of the jury gave his or her individual guilt and punishment determinations based upon the law and evidence presented at trial. This was certainly true for me.

I do not believe that the reading of the scripture violated the principles of justice. In my opinion, the reading of the scripture did not violate any right of the defendant. The scripture reading was not utilized in a way to bring prejudice against the defendant. I do not believe that there was any adverse judgment or opinion formed regarding the answers to the questions from the reading of the scripture or its content. I do not believe there was an detriment to the defendant caused by the reading of the scripture. I believe that the defendant received a fair and impartial trial. If I did not believe the defendant was accorded a fair trial, I would not be comfortable with my votes and the jury's verdict.

In my earlier affidavit signed through attorney Warren Clark, I did not mean to suggest that there was a connection between the reading of the scripture or its content and any member's ultimate vote in a way where the death penalty was assessed. Moreover, in the overall scheme of about a two week trial and several hours of deliberations, in my opinion, the above Bible reading was not related to the verdict returned to the court.

The trial court denied appellant's request for a hearing on his new trial motions. In a letter to the parties announcing its decision, the trial court stated:

While I recognize that "sometimes trial courts choose to *wisely* make a full record of factual matters in death penalty cases", I believe that such action is contrary to the public policy being promoted by Rule 606(b) of the Texas Rules of Evidence, in that it would subject the jurors to the rigors of direct and cross examination regarding

their deliberations.   Such public scrutiny of confidential deliberations would discourage open discussion among jurors and could potentially be threatening to the entire jury process.

To conduct a hearing simply to make a record, without any expectation that the hearing would result in admissible evidence, does not protect jurors from the inconvenience and potential harassment that such a hearing would impose. Therefore, under the present circumstances, I do not believe that the Defendant has raised an issue which would require an evidentiary hearing.[7]

(Emphasis in original).

A defendant is entitled to an evidentiary hearing on his motion for new trial if the motion

---

[7]This is consistent with the rationale that has been expressed for the general rule of not permitting a juror to impeach his own verdict. *See State ex. rel. Rosenthal v. Poe*, 98 S.W.3d 194, 202 (Tex. Crim. App. 2003).  For example, even in a case where a juror's affidavit indicated that the jury may have "adopted an unjust and arbitrary method" of arriving at its verdict, the United States Supreme Court stated:

The rule [that a juror cannot impeach his own verdict] is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

These two conflicting considerations are illustrated in the present case.  If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict.  But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.  If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*See McDonald v. Pless*, 238 U.S. 264, 267-68 (1915).

and accompanying affidavit(s) raise matters not determinable from the record, upon which the accused could be entitled to relief. *Wallace v. State,* 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). We review the trial court's decision under an abuse of discretion standard. *Martinez v. State,* 74 S.W.3d 19, 22 (Tex. Crim. App. 2002).

Appellant claims on appeal that the trial court should have held a hearing on his new trial motions and that the reading of Biblical scripture during the punishment-phase deliberations denied his rights to an impartial jury and punishment determination in violation of the 6th, 8th, and 14th Amendments to the United States Constitution. The State claims that appellant procedurally defaulted these constitutional claims on appeal because he did not raise them in the trial court. The State also claims that the trial court did not abuse its discretion to deny appellant's request for a hearing on his new trial motions, because the matters described in juror No. 7's first affidavit do not constitute an "outside influence" and would, therefore, be excluded by Rule 606(b) at a motion for new trial hearing.[8]

We find it unnecessary to decide whether the jury foreman's Bible reading in this case was an "outside influence," because this record presents no "reasonable grounds" that this Bible reading affected the jury's verdict. *See Wallace v. State*, 106 S.W.3d at 108 (defendant is entitled to hearing on motion for new trial to make a record of matters not determinable from the record if the defendant establishes the existence of "reasonable grounds" showing that the defendant "could be entitled to relief"). The record presented to this Court indicates that this brief reading of Biblical scripture, which was essentially an admonishment to follow man's law (and, therefore, duplicated what was

---

[8]The State argues that "a juror's affidavit that described matters that did not constitute an 'outside influence' could not be used to support a live hearing on a motion for new trial based on jury misconduct."

already in the court's charge), occurred near the beginning of jury deliberations. The affidavits clearly indicate that the scripture had no effect on the jury's verdict rendered some hours later.[9] We, therefore, cannot conclude that the trial court abused its discretion in declining to hold a hearing on appellant's new trial motions. For the same reason, any constitutional error that appellant may have preserved as a result of this Bible reading was harmless beyond a reasonable doubt. Points of error one and two are overruled.[10]

---

[9]The record indicates that jury deliberations began at 12:20 pm and ended at 5:19 pm. The record also indicates that the scripture was read near the beginning of the deliberations, thus the jury deliberated for many hours after the scripture was read and before they rendered a final verdict.

[10]We also note the Ninth Circuit Court of Appeals' decision in *Fields v. Brown*, a state of California death-penalty case in which the jury foreman made notes "for" and "against" imposition of the death penalty after consulting the Bible and other texts. *See Fields v. Brown*, 503 F.3d 755, 776-82, 780 (9th Cir. 2007). The "for" notes included a reference to Romans 13:1-6, and to other Biblical scripture such as an "eye for an eye" and Exodus 21:12, which states, "He that smiteth a man, so that he dies, shall surely be put to death." *See id*. The jury foreman's "for" and "against" notes were shared with other jurors during punishment deliberations. *See id*.

The defendant presented a "number of juror declarations" to the federal district court in support of his claim that the references to the Bible and other texts during jury deliberations in the state court proceedings constituted jury misconduct. *See id*. The federal district court and the Ninth Circuit analyzed this claim under Federal Rule 606(b), which is more expansive than Texas Rule 606(b), because Federal Rule 606(b) permits jurors to testify "whether extraneous prejudicial information was brought to the jury's attention." *See Fields*, 503 F.3d at 776-83.

The federal district court struck most of the juror declarations as being inadmissible under Federal Rule 606(b). *See Fields*, 503 F.3d at 778. Based on what was left, the federal district court found "that the religious material in the [foreman's] notes was actually received by the jury, was available to it on the second day of deliberations, was discussed by some jurors, was presented at an early stage of deliberations before a verdict was reached, and directly related to a material aspect of the case because the references indicated that the death penalty should be imposed in any case involving murder." *See id*. The federal district court concluded that "the jury's consideration of Biblical references offended the principle that religion may not play a role in the sentencing process, and that it had the potential to be highly prejudicial." *See id*.

In suggesting that the jury could properly consider the jury foreman's "for" and "against" notes, the Ninth Circuit stated that "the Biblical verses and the other concepts contained in the notes are notions of general currency that inform the moral judgment that capital-case jurors are called upon to make." *See Fields*, 503 F.3d at 780. The Ninth Circuit ultimately decided, however, that

(continued...)

We understand appellant to claim in point of error three that the mitigating evidence instruction "unconstitutionally narrow[ed] the jury's discretion to factors concerning only moral blameworthiness."[11] We have previously rejected this claim. *See Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2005). Point of error three is overruled.

Appellant claims in point of error four that the trial court erroneously overruled his objections to the testimony of Royce Smithee,[12] who provided fact testimony about Texas prison conditions in

[10](...continued)
the jury foreman's notes were harmless, because they did not have a "substantial and injurious effect" on the jury's verdict. *See Fields*, 503 F.3d at 781-82. The Court stated:

> Whether or not [the jury foreman] should have brought his notes to the jury room and shared them, we cannot say that the Biblical part of the "for" part of the notes had a substantial and injurious effect on the verdict. His own notes had an "against" part as well. So far as we can tell, the communication occurred early on in the deliberations. Jurors could take as much time as they needed to sort through the evidence and reflect on whether the ultimate penalty was the right penalty. More importantly, the jury was instructed to base its decision on the facts and the law as stated by the judge, regardless of whether a juror agreed with it. We presume that jurors follow the instructions.

*See id*. (Footnote and citations to authority omitted).

[11]Our understanding of the claim presented in appellant's third point of error is based on appellant's reference in his brief to his amended motion for new trial, which presented this specific claim to the trial court for the first time. The question appellant presents in point of error three is:

> Does Art. 37.071 sec. 2(f)(4) Code of Criminal Procedure violate the 5th, 6th, 8th and 14th Amendments to the United States Constitution as well as those principles underlying Tennard v. Dretke, 542 U.S. 274, 124 S.Ct. 2562 (2004)?

[12]Smithee is the "chief investigator for the Special Prosecution Unit," which is a "prosecutor assistance program out of the governor's office" with the primary function "to investigate and prosecute, help the DA prosecute, criminal offenses that occur in the prison system and/or on state property."

general and opinion testimony that violence can occur within the Texas prison system.[13]  Appellant

claimed that Smithee's testimony was irrelevant under TEX. R. EVID. 401 and, therefore, would not

aid the jury in determining a fact in issue under TEX. R. Evid. 702.  The trial court ruled that Smithee

could testify generally about the operations of the Texas prison system and offer an opinion that

violence can occur there.

> [DEFENSE]: Judge, we don't believe that in this particular case–although, obviously we would be disagreeing on different grounds if Mr. Smithee were trying to draw directly to [appellant].  But with regard to this case, what the State's wanting to do is to not get into the actual future dangerousness mode, but try to make an illusion or a suggestion to the jury that because violent acts do occur in prison, that [appellant] is going to commit that.
>
> If they cannot individualize and show evidence particular to [appellant's] probability to commit future acts of violence in the future, then the evidence is not relevant.
>
> That's what their burden is–and that's what this gentleman will have to prove–showing the prison system is fine unless they're going to try to go into the fact that violence can occur in prison.  But he can't give us any handle or any help as to whether or not this particular Defendant would be a violent risk in the future, so we believe it's not relevant under 702 and we would ask the Court to exclude him.
>
> [THE COURT]: The objection as to relevance will be overruled.
>
> Counsel, Mr. Smithee will be allowed to give factual testimony about the operations of the Institutional Division of the Texas Department of Criminal Justice, and I don't believe an opinion is necessary in any area.
>
> [STATE]: I think, Your Honor, as far as opinion goes, the furtherest (sic) that he would be asking Mr. Smithee questions in that regard was if any inmate chose to commit an offense within the prison system, could they within the system as it's set up today, do that if they chose to do so.  But we are not going to be applying that

---

[13]The question appellant presents in point of error four is:

Did the trial court abuse its discretion in admitting Smithee's testimony concerning violence in prison and the inner workings of prison when the witness could not and did not opine that the circumstances, facts and events described by Smithee would specifically apply to Appellant in his situation?

directly as to he just begs our question on that.

[DEFENSE]: I don't believe there's any question that an inmate could do that if they wanted to, you know, whether it be with their hands or otherwise. But they're trying to draw a parallel between this Defendant and general suggestions that they're going to say and they just simply can't do that. But they want to try to throw that out in front of the jury, so we believe that again–we're not trying to argue with the Court, I apologize, but that it should not be admissible.

[THE COURT]: Okay. The objection will be overruled.

Mr. Smithee will be entitled to give opinion testimony as to whether or not violence can occur within the system, and factual testimony about the operations of the Texas Department of Criminal Justice, Institutional Division, but would prohibit opinion testimony as to probability or any kind of specific percentages.

The record also reflects that, as part of its case at punishment, the defense claimed that "in an incarcerated setting, [appellant] is not going to be a problem" and that a life-sentenced appellant "would do well in prison." In addition to presenting Smithee's testimony that violence can occur within the Texas prison system,[14] the State also presented evidence that appellant had a "pattern of violence that stretche[d] back for 20 years." This evidence included numerous assaults that appellant committed during this period of time against various people, including members of his own family, with some of these assaults involving firearms.

An issue for the jury's determination was appellant's future dangerousness. *See* Article 37.071(b)(1), TEX. CODE CRIM. PROC. The trial court did not abuse its discretion to decide that

---

[14]For example, Smithee testified that a "defendant" within "the prison system" can be "as violent as he wants to be when that opportunity arises."

Q. [STATE]: Is your testimony limited just to the fact that if a defendant chooses to exercise his choice and commit a violent crime within the prison system, is it your testimony that he will have the opportunity to do that?

A. [SMITHEE]: An individual can be as violent as he wants to be when that opportunity arises.

Smithee's testimony that inmate violence can occur under current prison conditions had some relevance to, and would have aided the jury in determining, appellant's future dangerousness, such as considering whether a life-sentenced appellant, with his history of assaultive behavior, would have opportunities to commit violent acts in prison. *See Threadgill v. State*, 146 S.W.3d 654, 670-71 (Tex. Crim. App. 2004) (trial court did not abuse its discretion to admit photographs of bombs and weapons made by inmates in Texas prison system because "evidence regarding weapons made by prison inmates was at least marginally relevant to the testimony concerning inmate violence within various classifications of prison society"); *Canales v. State*, 98 S.W.3d 690, 699 (Tex. Crim. App. 2003) (testimony regarding inmates' ability to defeat locking mechanisms on prison cell doors relevant to future dangerousness special issue).

Appellant also claims on appeal that the admission into evidence of Smithee's testimony violated his Eighth Amendment right to individualized sentencing. The record, however, reflects that appellant did not present this Eighth Amendment claim to the trial court. He, therefore, failed to preserve this Eighth Amendment claim for appellate review. *See* TEX. R. APP. PROC. 33.1(a)(1). Point of error four is overruled.

In point of error five, appellant claims that the State delivered improper jury argument at the punishment phase.[15] The record reflects that appellant's brother testified at the punishment phase that appellant broke into his home in February 1995. Appellant was indicted for burglary as a result

---

[15]The question appellant presents in point of error five is:

> Was the prosecutor's assertion that Appellant's and his family's influence in persuading the prosecuting authorities to extend leniency for Appellant's involvement in a burglary of a family member's residence so prejudicial that it had a substantial and injurious effect or influence in determining the jury's answers to the special issues and therefore, affected Appellant's substantial right to a fair trial?

of this incident. Appellant's brother testified that he told a police officer the day after the incident that he did not want to press charges and that he later signed "a form with the District Attorney's office asking them to not prosecute" appellant.

Q. [STATE]: Okay. Now, let's talk about since that day. You told the police officer that night or that next day that you did not want to press charges against [appellant]?

A. [APPELLANT'S BROTHER]: Yes.

Q. And they did press charges against him, correct?

A. Correct.

Q. And later on, just a month or two later, basically, you changed your mind on that, didn't you, or you made a request of them. Is that a fair statement?

A. I believe so.

Q. What was that request?

A. I didn't want him to pay for any of the damages or anything like that.

Q. Did you also sign a form with the District Attorney's office asking them to not prosecute him?

A. I believe I did.

Q. What was your purpose in doing that?

A. I love him and respect him.

Appellant eventually received two years deferred-adjudication community supervision for that burglary offense pursuant to a plea bargain. During closing arguments, the State argued, over appellant's objection:

[STATE]: Mitigating evidence. You want to talk about that a little bit and we will for awhile. But right now, I want to particularly call your attention to one particular thing that they kept saying. You know, he's sorry, he's nice, he's a wonderful guy.

Guess what, folks? I submit to you that's the exact same thing he told the prosecutors back in 1995 and he got off light. He got a break because his family wanted him to have a break. And, Lord, help us, look where we are now. Because I'm sure that prosecutor thought long and hard about what to do because of the facts of the case–

[DEFENSE]: Judge, I'm going to object to that, that's inviting the jury to speculate outside the record.

[THE COURT]: The objection will be overruled.

[STATE]: –about the facts of that case, as well as the considerations that that family asked for leniency for their brother so he wouldn't have to testify. And they won the day and look where we are. You cannot allow them to win the day again. If you do, to whom and for what will we have to allow [appellant] to apologize for again?

Appellant claims that the State's "reference to facts suggesting that Appellant and his family took pains to influence the prosecution was not inferable from the evidence and as such, was wholly improper" by injecting into the trial "new facts harmful to Appellant." We decide that the State's argument was a reasonable deduction from brother Robert's testimony that he told a police officer that he did not want to press charges and that he believed that he later signed a form with the District Attorney's office not to prosecute appellant. *See Holberg v. State*, 38 S.W.3d 137, 141 (Tex. Crim. App. 2000) (a permissible area of jury argument is reasonable deduction from the evidence).

In addition, any error in the overruling of appellant's objection to the State's argument was harmless, because, on this record, any unsupported-by-the-record assertion that appellant's family may have influenced the authorities to show leniency on appellant in the 1995 burglary case had little, if any, influence on the jury's answers to the special issues. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (non-constitutional error is harmless when "the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight affect."). We believe that the jury's answers to the special issues turned primarily

on the facts of the offense (the brutal murder of three neighbors in their home for no apparent reason) and appellant's history of assaultive conduct. We do not believe that the jury's answers to the special issues resulting in appellant's death sentence hinged on any efforts by appellant's family to persuade the authorities to show leniency on appellant in the 1995 burglary case. *See id*. Point of error five is overruled.

We understand appellant to claim in point of error six that the trial court erroneously denied his request for a mistrial. He claims that he was entitled to a mistrial when the State's punishment-phase closing jury arguments directly commented on appellant's failure to take the stand at the punishment hearing to express remorse for murdering his three neighbors.[16]

The record reflects that appellant presented the testimony of a psychological expert (Schneider) whose testimony was based, in large part, on statements appellant made to him during a psychological evaluation after appellant committed the offense in this case. Schneider's written psychological evaluation of appellant was also introduced into evidence as Defense exhibit 1. Among other things, Schneider's written psychological evaluation of appellant concluded that "[p]ersonality assessment suggests [appellant] to be chronically depressed and to experience intense suspicion of others, to maintain a strict guardedness and distance from others and to feel some relative comfort only in solitary conditions."

Schneider testified consistently with his written psychological evaluation of appellant and also testified generally about "sociopathic behavior," with one of its indicators being "very little

---

[16]The question appellant presents in point of error six is:

Did the trial court commit reversible error in failing to grant a mistrial as a result of the prosecutor's direct comment that Appellant had somehow neglected to demonstrate consideration or remorse for the crime of which he was convicted?

remorse." Schneider also testified that, with "the limited information" he had, he could not say "definitively" that appellant was "sociopathic."[17] He also testified regarding appellant's demeanor during the evaluation, particularly "in specific reference" to this capital murder offense.

> Q. [DEFENSE]: What was his demeanor when he was talking with you on all these issues?
>
> A. [SCHNEIDER]: He was–he became–in specific reference to that incident, he became very quiet, very reserved, very guarded. I tried to, kindly as possible, get as much information as possible, but he became tearful and he just chose not to talk about it.

This was consistent with Schneider's written psychological evaluation of appellant, which stated:

> Regarding the incident(s) in question, Mr. Lucero was asked if he remembered the incident(s). He stated, "Yes." When asked to describe what led up to the incident in question, Mr. Lucero became tearful and chose not to discuss the actual incident. He stated that it occurred in September 2003, that he was home "just by myself." When asked what occurred on that day, he stated, "I just don't want to talk about it." The subject became withdrawn, tearful and unresponsive to any type of inquiry. The interview was completed at that point.

We understand appellant to have claimed, during the State's closing jury arguments, that the following emphasized portion of the State's jury argument could only have been understood by the

---

[17]Schneider also testified on cross-examination that sociopaths "show little remorse."

> Q. [STATE]: Let's talk a minute about antisocial personality disorder. Can you give me some criteria for that, sir–well, let me ask you, would the criteria include failure to conform with social norms?
>
> A. [SCHNEIDER]: Yes.
>
>                    * * *
>
> Q. And those that show little remorse?
>
> A. Yes.

jury as a comment on appellant's failure to take the stand to express remorse:

> [STATE]: He's a good killer. He slaughtered and massacred the heart of the Robledo family in less than 2 minutes. He killed Pedro, Manuela and Fabiana, shot at Soccorro, and but, for I'll submit to you, the grace of God, for Guadalupe to be turned sideways so that the shot went through her arm before it struck her body, or she would be dead, also. And she was fortunate enough not to cut a major artery in her arm and she still nearly died.
>
> This Defendant did all that in the presence of an 18-month-old boy, who now fears sirens, fears police, fears ambulances; and those are the folks he's supposed to trust and believe in. Will he ever get over that? Who knows?
>
> The thing we do know is he will have to live with it for the rest of his life. **We don't know whether he's concerned about it at all, folks**.[18] We really don't–
>
> [DEFENSE]: Judge, I'm going to object–may we approach the bench?
>
> (On-the-record conference had at Bench:)
>
> [DEFENSE]: Judge, that last comment was an overt comment on the failure of the Defendant to testify and we would object.
>
> [THE COURT]: The objection will be sustained.
>
> [DEFENSE]: We would ask for an instruction to the jury to disregard that, and after that instruction, we would move for a mistrial.
>
> [THE COURT]: The motion for a mistrial will be denied. I will give you an instruction about the comment.
>
> [DEFENSE]: Thank you, Judge.
>
> (Proceedings had in open court)
>
> [THE COURT]: Ladies and gentlemen, I will instruct you to disregard any comments or arguments by the Prosecution as to whether or not the Defendant is concerned and

---

[18]The record, therefore, does not necessarily support the assertion that the State's jury argument was a reference to appellant's lack of remorse. The State's jury argument that "[w]e don't know whether [appellant's] concerned about it at all, folks" was consistent with Schneider's testimony and his written evaluation setting out appellant's statement, "I just don't want to talk about it."

I'll leave it at that.

Mr. Sims.

[STATE]: From the evidence submitted to you by their witnesses, there's no evidence of that. That's what I'm telling you, folks. There's no evidence of that, just like there's no evidence of remorse. There's no evidence that what transpired and what will transpire in prison that he will try to do anything to help any of those inmates.

He's controlling. He's jealous. He's manipulative. He's impulsive. He's irritable. He's aggressive. He's reckless, with a disregard for the safety of others. He has irresponsible work behavior. And he shows little remorse.

(Emphasis supplied).

On this record, it is not clear that the jury would have naturally understood the State's argument that "[w]e don't know whether [appellant's] concerned about it at all, folks" as referring to appellant's failure to take the stand at punishment to express remorse. *See Ladd v. State*, 3 S.W.3d 547, 569 (Tex. Crim. App. 1999) (State's jury argument commenting on defendant's lack of remorse could have been interpreted by jury as referring to testimony of psychiatrist, who testified that defendant was a sociopath and had no remorse for his crimes).[19] To the extent that the State's

---

[19] Arguably, on this record, it would have been permissible for the State to have commented on appellant's lack of expression of remorse during his evaluation by Schneider, because such a comment is supported by the record and is encompassed within Schneider's evaluation of appellant, particularly whether appellant has indicators or characteristics of a sociopath. *Compare Renteria v. State*, 206 S.W.3d 689, 697 fn.4 (Tex. Crim. App. 2006) (prosecutorial unsupported-by-the record comment on defendant's lack of expression of remorse may be impermissible comment on defendant's failure to testify). The jury, therefore, could have manifestly and naturally understood the State's argument as a permissible reference to appellant's lack of expression of remorse during his evaluation by Schneider and not as an impermissible reference to appellant's failure to take the stand at the punishment hearing to express remorse. *See Cruz v. State*, 225 S.W.2d 546, 548 (Tex. Crim. App. 2007) (test to determine whether prosecutorial argument is comment on a defendant's failure to testify "is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify") (quoting *Bustamonte v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001)).

argument could have been so construed by the jury, appellant was not entitled to a mistrial, because the trial court's instruction to disregard was sufficient to cure any prejudice stemming from the State's argument. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (grant of mistrial motion should be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not have cured, the prejudice stemming from an event at trial); *Caldwell v. State*, 818 S.W.2d 790, 799-800 (Tex. Crim. App. 1991)[20] (any improper jury argument by State alluding to defendant's lack of remorse was cured by trial court's instruction to disregard).[21] In addition, appellant failed to object to the State's subsequent jury arguments that "there's no evidence of remorse" and that appellant "shows little remorse." Appellant, therefore, is not entitled to a reversal due to the State's earlier objected-to reference to appellant's lack of remorse. *Cf. Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (overruling of objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling).

In point of error seven, appellant appears to argue that Article 37.071, TEX. CODE CRIM. PROC., is unconstitutional because it fails "to provide a method by which the State of Texas determines the deathworthiness of a capital defendant."[22] Appellant relies primarily on the Supreme

---

[20]Overruled on other grounds by *Castillo v. State*, 913 S.W.2d 529, 532-35 (Tex. Crim. App. 1995).

[21]Appellant claims on appeal that the trial court's instruction to disregard was "tepid" and "not forceful enough to cure the error." The record, however, reflects that appellant made no such claim at trial. In addition, appellant's argument that the trial court's instruction to disregard "was not forceful enough to cure the error" effectively concedes that any prejudice in the argument was curable by an instruction to disregard.

[22]The question appellant presents in point of error seven is:

(continued...)

Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000). We have rejected the arguments that appellant appears to present in this point of error. *See Threadgill v. State*, 146 S.W.3d at 671-72 (rejecting defendant's argument that "because Article 37.071 fails to provide a mechanism by which the State determines the death worthiness of the Defendant, it does not provide 'some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied'"). Point of error seven is overruled.

The judgment of the trial court is affirmed.

Hervey, J.

Delivered: February 13, 2008
Publish

---

[22](...continued)
Does Art. 37.071 of the Texas Code of Criminal Procedure fail to provide a method by which the State of Texas determines the deathworthiness of a capital defendant, thereby eliminating consistency in the decision to seek the death penalty and weakening the degree of accuracy required in imposing death, in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution?