# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00646-CR

**Zavian Thomas, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. D-1-DC-06-301206, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Zavian Thomas was convicted of injury to a child and sentenced to 55 years in prison.[1]  He contends that the judgment is erroneous because the trial court failed to suppress his videotaped and written statements to police, the evidence is factually insufficient to support the judgment, and the trial court erred by refusing to hold a hearing on his motions for new trial.  We affirm.

On May 28, 2006, at around 9 p.m., Janice Ward called Thomas, her boyfriend, to tell him that she was coming home from work early.  Ward said that Thomas sounded "panicked" and told her that their four-month-old son was not moving.  Ward told him to call 911.  Instead, he took the baby to a neighbor and asked for help.  The child was limp and not breathing, and the

---

[1]  The jury was deadlocked on the charge of capital murder, and the trial court granted a mistrial on that charge.

neighbor began administering cardiopulmonary resuscitation while instructing her child to call 911. Paramedics arrived and were unable to revive the child, but his heartbeat was restored at the hospital. However, doctors at the hospital told Ward and Thomas that the child would not survive. The doctors believed the child was suffering from shaken baby syndrome.

While the child was in the hospital, police questioned Thomas, Ward, and others regarding the events resulting in the child's injuries. They questioned them early on the morning of May 29, 2006, after the child was hospitalized and then, after searching the apartment later that morning, they questioned Thomas again. Both interrogations were videotaped at police headquarters. Thomas also signed a written statement. The child died within a day of being hospitalized.

Before trial, Thomas sought to have his statements to police suppressed on the theory that they were the product of custodial interrogations when he had not been properly advised of his rights. During trial, Thomas introduced evidence regarding the cause of the child's death that he believes overcomes the State's theory that the death was the result of shaken baby syndrome. Thomas's evidence included evidence in support of his theory that the child died as a result of choking on the contents of his bottle of formula and evidence challenging the scientific basis of the theory of shaken baby syndrome. After the verdict, Thomas requested a new trial on the theory that the prosecutor had improperly removed key trial exhibits and that the jury was, accordingly, not provided those exhibits for review.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *see also Guzman*

2

*v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial court's findings of fact are given

"almost total deference" and, in the absence of explicit findings, the appellate court assumes the

trial court made whatever appropriate implicit findings that are supported by the record. *Carmouche*,

10 S.W.3d at 327-28; *Guzman*, 955 S.W.2d at 89-90. The trial court's denial of a motion to suppress

is reviewed for abuse of discretion. *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999).

Thomas asserts that the court should have suppressed statements he gave to police

because he was in custody during the interviews and the police did not provide the requisite *Miranda*

warnings. The court of criminal appeals has described situations that may constitute custody

as follows:

> (1) when the suspect is physically deprived of his freedom of action in any significant
> way, (2) when a law enforcement officer tells the suspect that he cannot leave,
> (3) when law enforcement officers create a situation that would lead a reasonable
> person to believe that his freedom of movement has been significantly restricted, and
> (4) when there is probable cause to arrest and law enforcement officers do not tell the
> suspect that he is free to leave.

*Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Stationhouse questioning does

not, in and of itself, constitute custody. *Id*. Nevertheless, a noncustodial interview can become a

custodial interrogation based on the information disclosed or the conduct of the police. *Id*. Custody

exists under category four outlined in *Dowthitt* if the manifestation of probable cause, combined with

other circumstances, would lead a reasonable person being questioned to believe that he is under

restraint to the degree associated with an arrest. *Id*.

In *Dowthitt*, the court of criminal appeals held that a defendant who voluntarily

went to the police station for questioning concerning some murders was in custody when he admitted

3

being present when the murders were committed. *Id*. at 256. That admission gave police probable cause to arrest the defendant. *Id*. Additional circumstances leading to the determination that the defendant was in custody included that he had been interrogated for twelve hours when he made the admission, that he was accompanied when he went to the bathroom, and that his two requests to see his wife were ignored. *Id*. These circumstances overcame the fact that the defendant never asked to leave and was not told he could not leave until thirty minutes after he admitted that he was present during the murders. *Id*.

Thomas contends that each of his interrogations meets this standard. He notes that police knew almost immediately after the child's admission to the hospital that appellant had been alone with the child when doctors believed the child was severely shaken, causing his injuries. Austin Police Department Detective Lisa Morrill assigned Officer Gary Jaime to follow appellant around the hospital and told Jaime that Thomas was not free to leave. Detective Richard Faithful instructed doctors not to tell the baby's parents that assault was suspected because he feared they would stop cooperating. Thomas was taken to police headquarters twice—once at about 2 a.m. (almost five hours after he first sought help for his son) and again at about 2 p.m. In between those sessions, police obtained and executed a search warrant for Thomas's apartment and learned that the child likely became symptomatic within four hours of being shaken. Based on information gained from interviews with Thomas, Ward, and their roommates, that timeframe placed the child solely in Thomas's care at the suspected time of injury. Faithful did not stop questioning Thomas during the second interview when Ward asserted there was a family emergency. Faithful, who was in contact with a nurse at the hospital, rejected the claim of emergency and continued the

4

interview. Faithful thereafter ignored his pager. The State concedes that the second interview was confrontational at times. Thomas contends that these circumstances provided both probable cause to arrest him and a basis for a reasonable person to believe that he was not free to leave either of the interrogations.

Other evidence, however, weighs against concluding that the police had probable cause to arrest Thomas or that he needed to be, but was not, told that he could leave. Jaime testified that he did not tell Thomas that he was not free to leave the hospital. Although Faithful was told that Thomas was alone with the child when the child became symptomatic, Faithful testified that he needed to investigate to determine who had access to the child during the critical period before the child became symptomatic. Faithful testified that Thomas accompanied him to headquarters voluntarily and was not in custody or detention. According to Faithful, Thomas stated, "I will do whatever I need to do to figure out what happened to my baby." Faithful told Thomas that police would provide a ride back to the hospital. Faithful testified that he would have taken Thomas back to the hospital even if Thomas had confessed to killing the child. Thomas rode to police headquarters uncuffed in a "regular" Ford Taurus that did not have a cage divider between the driver and passenger. At the end of his first interview, police drove Thomas back to the hospital. Although Faithful learned between the interviews that doctors had concluded that the child was likely severely shaken while Thomas had sole control over the child, Faithful did not tell Thomas that information and instructed doctors not to tell Thomas about their conclusion.[2] Thomas voluntarily returned to

---

[2] Dr. Renee Higgerson testified that she told Ward that she believed that someone had injured the child. Higgerson testified that Thomas was not present.

5

police headquarters, again uncuffed, for the second interview. Ward initially stayed at the hospital. Faithful did not end the interview when Ward later came to police headquarters and tried to stop the interview based on a "family emergency" because he discounted that claim based on information he was receiving from the hospital. When Thomas thereafter requested that the interview end, Faithful stopped the interview, and Thomas returned to the hospital with Ward and his lawyer.[3] Police did not seek a warrant for Thomas's arrest until the day after the child died. They did not arrest him until the next day.

We conclude that the trial court did not abuse its discretion by finding that Thomas was not in custody when he gave the videotaped and written statements. The focus of the *Dowthitt* custody scenarios is whether the defendant was questioned in an environment that had a coercive element because a reasonable person in the defendant's position would have believed that police had grounds to arrest him and that he was not free to go. There is evidence in the record to support a finding by the trial court that a reasonable person in Thomas's position would have believed he was free to go when police questioned him. Police did not tell Thomas about the doctors' conclusions that the baby's condition was caused by being severely shaken while alone with him. Police did not tell Thomas he was not free to go. Rather, they told him he was free to go and allowed him to go when he asked to leave. These circumstances place this case outside of the circumstances described in *Dowthitt*. The trial court did not abuse its discretion by denying the motion to suppress.

---

[3] This reportedly was the first indication to police that Thomas had a lawyer. Faithful testified that Ward told him the attorney had been hired earlier that afternoon.

Thomas asserts in his second issue that the evidence is factually insufficient to support the verdict. In a factual sufficiency review, we view the evidence in a neutral light and ask whether a finder of fact was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Id*. at 417.

The court instructed the jury that "[a] person commits the offense of injury to a child if he knowingly by act causes to a child serious bodily injury." *See* Tex. Penal Code Ann. § 22.04 (West Supp. 2008).[4] The court submitted the alternate means of commission alleged by the State, including that Thomas struck the child with his hand or a blunt object, that Thomas caused the child to hit a blunt object, or that Thomas used his hands to shake the child's body or head.

The central issue in our sufficiency review is whether the evidence supports the State's characterization of the medical evidence. There is no significant dispute concerning the child's injuries, but there is disagreement over the cause of those injuries. There is no direct evidence from anyone who claims to have witnessed the event that caused the injuries. Both sides rely on medical theories presented by doctors explaining how a child might incur the injuries

---

[4] Although the statute also describes the offense of injury to a child as the product of recklessness or criminal negligence, the court did not submit a charge on these lesser-degree felonies.

suffered by the victim. The State contends that the injuries are consistent with shaken baby syndrome and that the timing of the manifestation of those injuries is consistent with the shaking having occurred when the child was alone with Thomas. By contrast, Thomas presented evidence questioning the scientific soundness of shaken baby syndrome, as well as testimony that the injuries are consistent with choking on liquid. Thomas's theory is that the child's death was the result of an accident, essentially drowning on the contents of his bottle and/or his own vomit. He contends that the evidence is factually insufficient to support the theory that he knowingly caused the child's death in the manner alleged by the State.

There were three general areas of injury to the child. The child had bleeding and swelling of his brain, bleeding in his eyes, and broken ribs. The State attributes all of these to Thomas's use of force against the child. Thomas theorizes that the child choked on liquid, cutting off oxygen to his brain, causing bleeding in his brain and eyes. He attributes the rib fractures to CPR. He points to the paramedics' observation of fluid in the child's lungs as supporting his theory.

Dr. Renee Higgerson treated the child in the intensive care unit. She testified that there was "no real big evidence of trauma to him." She testified that some bruising appeared around his ribcage. She testified that ribs were broken both on the child's front and back, and that she was not aware of any reports or literature reflecting a child suffering posterior rib fractures from CPR. The serious injuries were internal, where the child's brain was bleeding and his retinas were hemorrhaging. Higgerson testified that the retinal hemorrhages were so prominent that they were visible without any equipment—something she had never seen before. While each of the conditions could occur from other causes, the fact that they appeared together in the absence of evidence of

8

another trauma—e.g., a car wreck—was a "classic presentation of shaken baby syndrome." She believed that the head injuries could have been caused by either vigorous shaking or his head being struck by a blunt object that was soft enough not to cause external injury. She testified that a person using such force against a child would know that the force could cause serious bodily injury or death. She testified that a child choking could have brain swelling, but she had never seen subdural hematomas, retinal hemorrhaging, or posterior rib fractures associated with choking.

Pediatric ophthalmologist Dr. Hillary Onan testified that, based on her examination of the child, she concluded that he had been shaken violently. She said that retinal hemorrhages were common in such cases, but retinal detachments were rarer because the force required is so much greater. She also testified that the child had a paramacular fold, which is consistent with severe shaking. She testified that this was one of the two worst shaken baby cases she had seen. She said that the sites of hemorrhaging were too numerous to count—a thousand or more. Children who survive shaking normally have fewer than twenty such sites. Onan contrasted that observation with other types of trauma—for example, a child who was ejected from a car and flew 100 feet had no more than three small spots of blood in each eye. She conceded that retinal hemorrhaging can also result from intracranial pressure, a crush injury to the chest, or vomiting. Onan rejected the theory that these conditions could have caused the extensive bleeding she observed in the child.

Pediatric radiologist Dr. Gael Lonergan reviewed the images taken of the child and testified that the progression of the swelling indicated that the child was injured in the evening. She opined that the posterior rib fracture was inconsistent with CPR. Lonergan testified that a person who chokes will suffer swelling in the brain, then bleeding, but a person who suffers a brain injury

9

will have bleeding, then swelling of the brain. She testified that the child's injuries were not consistent with choking, but were consistent with being violently shaken, slammed against a blunt object such as a mattress, or both.

Dr. George Edwards, director of the pediatric residency program at the Dell Children's Hospital, examined the child and reviewed the child's medical records. Edwards agreed with the other examining physicians that the child was killed by shaking or shaking plus impact—in either case, by non-accidental head trauma. He found no evidence of a clotting disorder or of milk or liquid in the child's lungs, and rejected the idea that any choking caused the brain injury, the retinal bleeding, or the rib fractures. Edwards acknowledged the criticism of the scientific underpinnings of shaken baby syndrome, but also testified that one of the studies on which the critics of shaken baby syndrome rely was itself based on flawed calculations. Edwards testified that proper calculations show that severe head injuries can result from shaking that does not cause neck injuries. He also testified that brain injury can cause clotting problems that can actually make bleeding worse. He testified, however, that the absence of widespread bleeding problems in the rest of the child's body persuaded him that the child's bleeding was due to localized trauma to the brain rather than a systemic clotting issue.

Former Chief Medical Examiner Dr. Roberto Bayardo performed the autopsy on the child. He ruled the child's death a homicide resulting from a severe closed head injury due to shaken baby syndrome. He testified that the broken ribs were consistent with a blow from a blunt object, not CPR. He also testified that his examination revealed that the child had suffered a broken rib about two months earlier. He opined that the child's death was caused by shaking, possibly

10

combined with blunt force trauma. Bayardo agreed, however, that a serious scientific reexamination of the underpinnings of shaken baby syndrome is underway.

Dr. John Galaznik criticized the scientific underpinnings of shaken baby syndrome. He testified that the shaking force required to cause fatal brain injuries would also cause significant neck injuries, which this child did not have. He also testified that experiments in which piglets were severely shaken produced brain injury, but not the retinal injuries attributed to shaking by proponents of shaken baby syndrome theory. Galaznik testified that the child had no injuries consistent with an impact injury, and that the State's witnesses may have added that theory to compensate for the challenges to shaken baby syndrome. Galaznik testified that choking deprives the brain of oxygen, which causes brain swelling that could lead to Disseminated Intravascular Coagulopathy. DIC causes clots that kill tissue, then an absence of clotting that will lead to uncontrollable bleeding. He also testified that low body temperature and a buildup of acid would inhibit blood from clotting. He testified that retinal bleeding could be caused by pressure from a swelling brain or a bleeding disorder, and that DIC could cause retinal detachment. Galaznik testified that blood tests taken within an hour of the child's arrival at the hospital showed that the child's blood was no longer clotting. Galaznik opined that the child choked, which caused brain injury and the cessation of clotting, which then manifested as brain and retinal bleeding. He opined that the rib fractures were consistent with CPR compressions. He characterized the progression of symptoms—no bruises or neck injuries, minimal intracranial bleeding and swelling at first, no impact trauma on the child's skull—as consistent with choking, not shaking or blunt trauma.

11

Other doctors agreed with Galaznik's analysis. Drs. Patrick Barnes and Mark Shuman, who examined the child's medical records, agreed with Galaznik's opinion that the child died as a result of choking rather than shaking. They were persuaded by the absence of evidence of a neck injury or head impact injury, combined with the progression of symptoms. Shuman joined Galaznik's criticism of the lack of science underpinning shaken baby syndrome theory. Ophthalmologist Dr. Horace Gardner agreed with Galaznik's opinion that the retinal injuries were caused by DIC, not shaking. Gardner testified that there is no scientific support for Onan's assertion that shaking a child can cause retinal hemorrhages and folds. He testified that any bleeding caused by shaking would have occurred immediately rather than worsening over time.

Other testimony bears less directly on the central issues. Paramedics who responded to the distress call found the child ashen, without a pulse, and not breathing. Paramedics heard gurgling sounds in the child's lungs, and noted fluid in his lungs and vomit around his mouth and nose. A paramedic administered CPR by circling his hands around the child's chest and compressing. Paramedics checked for signs of traumatic injury and found none. Thomas told police that he propped a bottle in his son's mouth while he went to the bathroom, and returned to find the child choking and having difficulty breathing. Thomas told the hospital social worker that, when he tried rescue breathing, fluid came out of the child's mouth. Thomas did not seek help for about twenty minutes. He displayed aggressive behavior at the hospital and raged against the makers of an electrolyte solution for infants. Thomas also attempted to flee when police arrested him.

We conclude that the evidence is factually sufficient to support the verdict. Sharply conflicting evidence was presented regarding the scientific basis of shaken baby syndrome and,

12

consequently, the diagnoses of the State's witnesses. The State's witnesses defended shaken baby syndrome and criticized the defense's alternate theory of the cause of the child's symptoms and death. Once admitted, this conflicting evidence presents an issue for the jury to resolve. We cannot say that the great weight and preponderance of the evidence contradicts the verdict. Accordingly, we find the evidence was factually sufficient to support the verdict.

By his third issue Thomas contends that the trial court erred by refusing to hold a hearing on his motions for new trial. Thomas's original motion asserted only that the trial court could grant a new trial in the interest of justice. In his amended motion, Thomas also asserted that the prosecutor engaged in misconduct including unlawfully removing pieces of documentary evidence (including photographs of the deceased child's eyes) from the courtroom and giving them to a witness, thereby depriving the jury the opportunity of reviewing them during deliberations. Thomas contended that the "jury requested 'all of the evidence,' but was never informed that the photographs were not included in the evidence provided when they deliberated Guilt." Thomas also raised other grounds not asserted on appeal.

We review the trial court's decision not to hold a hearing for an abuse of discretion. *See Holden v. State*, 201 S.W.3d 761, 764 (Tex. Crim. App. 2006). A defendant does not have an absolute right to a hearing in open court on a motion for new trial. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). The motion for new trial must be supported by an affidavit specifically showing the truth of the grounds alleged as a basis for a new trial. *Id*. at 816. A defendant is entitled to an evidentiary hearing on his motion for new trial if the motion and accompanying affidavit(s) raise matters not determinable from the record, upon which the accused could be entitled to relief.

*Lucero v. State*, 246 S.W.3d 86, 94 (Tex. Crim. App. 2008). A trial court has discretion to decide a motion for new trial based on affidavits alone, particularly where the affiants have already appeared in the trial court and "the trial judge ha[s] already had an opportunity to evaluate the affiants" and is "familiar with the history and the facts of the case." *Holden*, 201 S.W.3d at 764. A trial court's determination under such circumstances is entitled to deference on appeal. *Id.*; *see also Garza v. State*, 261 S.W.3d 361, 366 (Tex. App.—Austin 2008, pet. ref'd).

The trial judge who denied the motions for new trial conducted the trial, so he was familiar with the history and the facts of the case. No affidavits are attached to appellant's motions. The first motion does not assert any facts not determinable from the record. The issue from the second motion that is raised on appeal concerns procedural events of which the court was aware at the time they occurred. After argument, the court stated, "The exhibits which were admitted into evidence, if you want to see them, ask your bailiff and he will deliver them to you." The court then sent the jury to deliberate. The next discussion in the reporter's record is the court's statement: "There are three issues to take up. Number one, we have six photographs which are missing, and we think Dr. Onan may have them. We've got a call in to her because they are, I believe, her photographs. I'm going to tell the jury that." The judge then called the jury in and said:

> Okay. Three issues. Number one, we are missing six exhibits which were admitted into evidence. We cannot find them. We are contacting witnesses to see if they may have inadvertently yesterday got them stuck in with their stuff. We will let you know. But we are looking for six—I believe they are photographs.

The jury sent a request to review Dr. Bayardo's "Description of rib fractures (direction)," but there is no record concerning any other requests for testimony or evidence. The jury then sent a message

14

to the court that it was deadlocked on the murder charge and had reached a decision on the injury to a child charge. When defense counsel asked what the options were, the court said he could (1) have the jury continue deliberations, (2) release the jury for the evening, or (3) declare a mistrial on the murder count and find out the verdict in the injury count. Thomas chose the third option. The court then said it would discuss the issue of the missing exhibits with the foreperson of the jury. However, when the jury returned, the court discussed only the deliberations on the murder count before requesting the verdict on the injury count. The court then declared a mistrial on the murder count and learned that the jury found Thomas guilty of injury to a child.

After argument at the punishment phase, the court announced that "the six exhibits which were missing have been retrieved from the witness who inadvertently got them amongst her items. If you want to see them, just ask your bailiff." After the jury went to deliberate, the court made the following statement:

> We found out, I believe, Dr. Onan, who had come after 5:00, who had them in her materials and went home with them. . . . That's why I mentioned to the jury we have them. And that's why on guilt/innocence when they were told we don't have them, we are looking, why I mentioned they were available when they started deliberating today. But we did not have them. The jury did not ask for them.

Thomas then moved for a mistrial on the basis that these photographs were critical evidence that the jury was deprived of seeing. The court denied the motion.

Thomas's motions did not show himself entitled to a new trial or a hearing on those motions. He did not attach an affidavit to his motion substantiating any of his allegations, including his allegation that the prosecutor improperly removed the exhibits. The only indication in the

15

reporter's record of how the exhibits left the courtroom is the court's statement that Onan "had them in her materials and went home with them." Although the jury knew the exhibits were missing and were being sought, the appellate record does not contain a note or any other indication that the jury specially requested the missing exhibits. Refusal or failure to allow the jury to view exhibits is error only if the jury asks for the exhibits. *Lopez v. State*, 628 S.W.2d 82, 85 (Tex. Crim. App. 1982). Thomas knew that the exhibits were missing while the jury was deliberating and that they were believed to be in the doctor's possession, but he chose to learn the jury's verdict without waiting to see whether the photos could be found and given to the jury. Although the jury knew that the photos had been returned at the punishment phase, there is no request to see them in the appellate record even then. We conclude that Thomas's motions for new trial did not raise issues or proof that required the trial court to hold a hearing. The trial court did not abuse its discretion by failing to hold a hearing on the motions for new trial.

Affirmed.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed: May 14, 2009

Do Not Publish