IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,540






RAMIRO F. GONZALES, Appellant



v.



THE STATE OF TEXAS








ON DIRECT APPEAL FROM CAUSE NO. 04-02-9091-CR


IN THE 38TH JUDICIAL DISTRICT COURT


MEDINA COUNTY





 Price, J., announced the judgment of the Court and delivered an opinion in
which Meyers, Keasler and Holcomb, joined, and in which Keller, P.J., and
Hervey and Cochran, JJ., joined except as to point of error one. Johnson, J., filed
a concurring opinion. Cohcran, J., filed a concurring opinion in which Keller, P.J.,
and Hervey, J., joined. Womack, J., filed a dissenting opinion.


O P I N I O N



 The appellant was convicted in August 2006 of capital murder. (1) Based on the jury's
answers to the special issues set forth in the Texas Code of Criminal Procedure, Article
37.071, sections 2(b) and 2(e), the trial judge sentenced the appellant to death. (2) Direct appeal
to this Court is automatic. (3) After reviewing the appellant's ten points of error, we find them
to be without merit. Consequently, we affirm the trial court's judgment and sentence of
death.

STATEMENT OF FACTS

 The appellant was charged with intentionally causing the death of Bridget Townsend
by shooting her with a firearm during the course of committing or attempting to commit
aggravated sexual assault, kidnapping, or robbery. The evidence at trial established that,
while he was in the Bandera County jail waiting to be transported to prison on another
matter, the appellant asked to speak with the sheriff, James MacMillian. When MacMillian
met with him, the appellant stated that he had information concerning Townsend, a person
who had been reported missing almost two years earlier. Initially, MacMillian did not
believe him, but when the appellant asserted that he could show MacMillian where
Townsend's body was, MacMillian took him more seriously. With the appellant sitting in
the passenger seat giving directions and the jail administrator riding in the back, MacMillian
drove out of town to the ranch where the appellant and his family lived. After the paved road
ended at the ranch headquarters, they continued driving over caliche roads and jeep trails to
a remote cedar-covered hillside. They then walked another hundred yards to the location
where the appellant indicated that they would find Townsend's remains. As they walked, the
appellant described the jewelry Townsend had been wearing, where she had been standing
when he shot her, and where he had put her body. They saw a human skull about ten feet
from the place the appellant said he had left her. They then observed other bones that had
been scattered by wildlife, and they found jewelry that was similar to the jewelry described
by the appellant. After MacMillian and the jail administrator tied yellow evidence tape on
the trees to mark the location, they drove back to Bandera. MacMillian left markers along
the route so that he would be able to retrace it.

 The appellant volunteered two different stories during the drive back to the sheriff's
office. Initially, he stated that some people in the Mexican Mafia had needed a place to
dispose of a body, and so he let them use that location. Then, he stated that he was present
while other people committed an offense, but all he did was show them how to get to that
location. After they returned to the sheriff's office, the appellant gave additional conflicting
stories. A Texas Ranger, Skylor Hearn, testified that the appellant first told him that the
appellant had been hired by the Mexican Mafia and Townsend's boyfriend, Joe Leal, to kill
Townsend. Next, the appellant indicated that the Mexican Mafia was not involved, but that
he and Leal had agreed that he would kill Townsend. Finally, he stated that Leal had not
been involved, and that he had killed Townsend on his own. The appellant then admitted that
his previous stories had been lies. Hearn testified that the appellant provided details in his
final story that were consistent with evidence that was discovered during the investigation. 
The appellant gave a statement that was audiotaped and typed. The appellant reviewed,
revised, and signed the typed statement. At trial, Hearn read the typed statement out loud. 
The audiotape was played as well.

 In his statement, the appellant related that Leal, Townsend's boyfriend, was his drug
supplier. On or about January 14, 2001, he had telephoned Leal's house because he wanted
more drugs. Townsend answered the phone and told him that Leal was at work. Then, aware
that Townsend was there, he drove to Leal's house in order to steal cocaine. When
Townsend answered the door, the appellant walked past her to the bedroom closet where he
knew that Leal kept drugs, and he began searching. He found between $150 and $500 in
cash on a closet shelf, and he put it in his pocket. He did not respond when Townsend asked
him what he was doing. Townsend picked up the telephone and started dialing, telling him
that she was calling Leal. The appellant pushed her down, dragged her into the bedroom, and
tied her hands and feet with some nylon rope he had found in the closet. He asked her if Leal
had any drugs, and she told him no. He then carried her to the front door, where he paused
to turn out the lights so no one would see them, and then he carried her to his truck.

 The appellant then drove Townsend to the ranch. When they arrived, the appellant
stopped long enough to retrieve a high-powered .243-caliber deer rifle with a scope that he
knew was kept in his grandfather's ranch truck. The appellant stated that, at the time he took
the rifle, he intended to shoot Townsend because he did not want her to tell anyone that he
had "torn up" Leal's house and kidnapped her. Armed with the rifle, he got back into his
truck and drove Townsend to the location where her remains were later found. He untied
Townsend and walked her toward the brush, but when he started loading the rifle, Townsend
began crying and asking for her mother. She told the appellant that she would give him
money, drugs, or sex if he would spare her life. In response, the appellant unloaded the rifle
and took Townsend back to his truck, where he had sex with her. After she dressed, he
reloaded the rifle, walked her back into the brush, and shot her. He listened as her body hit
the ground, and then he drove home. When he got back to his grandparents' house, he
removed the empty shell casing from the rifle and slung the casing away from the house. He
put the rifle back into his grandfather's ranch truck and went inside. There, he interacted
with his family as though nothing had happened.

 While Hearn was taking the appellant's statement, MacMillian showed investigators
the location of Townsend's remains. They found Townsend's skull, most of her long bones
and some small bones, her clothing, her jewelry, and her shoes. Her rib cage and vertebrae
were never found. Gunshot residue tests on Townsend's shirt revealed the presence of lead. 
Hearn later seized three high-powered rifles with scopes that he found in the appellant's
grandfather's house and ranch truck. He showed them to the appellant, along with a rifle that
Hearn had borrowed from the sheriff's department, and asked the appellant if he recognized
any of them as the murder weapon. (4) The appellant immediately selected the .243-caliber rifle
that Hearn had seized from the ranch truck.

 Leal testified about the course of events that led him to report Townsend's
disappearance to police. He had spoken to Townsend on the telephone around 6:00 p.m. or
7:00 p.m., and she told him that she had to get up early for work the next morning. When he
came home from work a little after midnight, he believed that Townsend was asleep. Her
truck was parked outside and things "looked normal." Inside, her purse and keys were on
the counter as usual, but the house was cold because the heater had not been turned on. 
Townsend was not asleep on the couch where Leal had expected her to be, so he went into
the bedroom. When he saw that she was not in the bed, he looked around and noticed that
the door to the bedroom closet was open. A small box that he kept on a closet shelf was
sitting out on the ironing board, open and empty. It had contained between $200 and $300
in cash. Leal testified that Townsend never took money from that box without asking him
first. Becoming concerned, Leal began calling friends and family to see if anyone knew
where Townsend was. His sister and his friend helped him search the neighborhood. When
they could not find her, Leal called the police. He also contacted the appellant because
Townsend had told him that the appellant had come by the house earlier that day, and Leal
hoped that the appellant might have seen something while he was there. The appellant,
however, denied that he had been there that day. When Leal told the appellant that he might
as well tell the truth because Townsend had told him that he had come by, the appellant
continued to deny it.

SUFFICIENCY OF THE EVIDENCE

 In the appellant's first and second points of error, he claims that the evidence is legally
and factually insufficient to support a finding of guilt. However, the appellant does not
contend that the evidence taken as a whole is insufficient to sustain his conviction; rather,
he complains that his confession is not sufficiently corroborated by independent evidence. 
Thus, the appellant has blended the standard for whether a confession is sufficiently
corroborated with the standards for legal and factual sufficiency. These standards are
distinct. In the interest of justice, we will consider each standard.

 The appellant argues that his confession was not sufficiently corroborated by
independent evidence tending to establish that he murdered Townsend by shooting her with
a firearm, and that there was insufficient corroborating evidence tending to establish that he
murdered her in the course of committing robbery, kidnapping, or aggravated sexual assault. 
The corroboration requirement assures that a conviction cannot be obtained solely on the
basis of a confession, without some independent evidence that the charged offense was
actually committed. (5) When the offense is capital murder charged as a murder in the course
of committing another felony, independent evidence that a crime has been committed must
corroborate both the murder and the underlying felony. (6) "[T]he corpus delicti of murder is
established if the evidence shows the death of a human being caused by the criminal act of
another." (7) Similarly, the underlying felony need not be conclusively proven by corroborative
evidence; all that is required is that there be some evidence that renders the commission of
the offense more probable than it would have been without the evidence. (8) "It satisfies the
corpus delicti rule if some evidence exists outside of the extra-judicial confession which,
considered alone or in connection with the confession, shows that the crime actually
occurred." (9)

 Here, the jury was instructed that the appellant could not be convicted on the basis of
his confession alone. (10) The jury heard testimony from MacMillian, Leal, and other witnesses
that:

(a) Townsend vanished from her home, suddenly and without a trace,
leaving her keys, purse, and truck behind;

(b) Townsend's remains were found in a remote location on the ranch
where the appellant lived;

(c) almost two years after Townsend's disappearance, the appellant
directed the sheriff on a circuitous route over caliche roads, jeep trails,
and scrub land to Townsend's remains;

(d) a rifle matching the one the appellant said he had used to shoot
Townsend was found on the ranch, in the place where the appellant said
he had obtained it;

(e) lead was detected on Townsend's shirt;

(f) jewelry similar to that described by the appellant was found near
Townsend's remains; and

(g) money was taken from Townsend's house at the same time that she
disappeared, in an amount and from a location that were consistent with
the amount and location described by the appellant.

 As such, there was ample independent corroborative evidence rendering it more
probable than it would have been otherwise that Townsend's death was caused by the
criminal act of another.

 Next, the appellant asserts that the independent evidence was not sufficient to
corroborate his confession that he committed the underlying offenses of robbery, kidnapping,
or aggravated sexual assault. However, the jury could convict the appellant of capital murder
if it found the murder was committed during the course of any one of these disjunctively
charged underlying offenses. (11) Here, the independent evidence sufficiently corroborated the
appellant's confession to at least one of the underlying offenses.

 Concerning the underlying offense of kidnapping, Leal's testimony was evidence that
Townsend had planned to be at home, and was home, on the night she disappeared. 
Townsend's purse, keys, and truck were still at the house in their usual places when she left. 
These facts tended to show that Townsend did not leave home willingly. That she was
moved from the house, and that there were no signs of a struggle or an injury, tended to show
that she was alive when she left. (12) A rifle matching the one the appellant said he had used
to shoot Townsend was found in his grandfather's ranch truck, where the appellant said he
had obtained it, on the ranch where Townsend's remains were found. This evidence further
indicates that Townsend was alive when she was taken from her house to the ranch. The
appellant directed MacMillian on a circuitous route over caliche roads, jeep trails, and scrub
land to the remote location of Townsend's remains. This fact corroborates his statement that
he took her to that location.

 There was also independent evidence to corroborate the appellant's confession to the
robbery. Leal's testimony confirmed that money was taken from the house at the same time
that Townsend disappeared. His testimony concerning the amount of money taken and its
location on a shelf in his bedroom closet was consistent with the appellant's confession. (13) 
This evidence rendered the appellant's commission of robbery more probable than it would
have been, if it had been based on the appellant's confession alone.

 The State admitted in its response to the defense's motion for directed verdict that
there was little independent evidence to corroborate the appellant's confession to the offense
of aggravated sexual assault. However, the appellant's admissions to murder, kidnapping,
and robbery were sufficiently corroborated by independent evidence, and so it is not
necessary to address the matter further.

 In performing a legal-sufficiency analysis, we review all of the evidence in the light
most favorable to the verdict, and ask whether any rational trier of fact could have rendered
the jury's findings beyond a reasonable doubt. (14) In a factual-sufficiency review, the evidence
is reviewed in a neutral light. Evidence can be factually insufficient if the evidence
supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust,
or if the supporting evidence is outweighed by the great weight and preponderance of the
contrary evidence so as to render the verdict clearly wrong and manifestly unjust. (15) A
reversal for factual insufficiency should not occur when "the greater weight and
preponderance of the evidence actually favors conviction." (16) The sufficiency of the evidence
is determined by evaluating the probative weight of all the evidence that the trial judge
permitted the jury to consider. (17)

 In this case, the evidence presented at trial was both legally and factually sufficient. 
The appellant's confession alone would have been sufficient to prove his guilt of all the
elements of capital murder beyond a reasonable doubt. (18) The appellant did not present any
contrary evidence. Points of error one and two are overruled.


EXPERT TESTIMONY CONCERNING FUTURE DANGEROUSNESS

 In points of error three, four, five, six, and seven, the appellant asserts that the trial
court's admission of expert testimony concerning the appellant's future dangerousness
violated the requirements of Nenno (19) and Rule 702 of the Texas Rules of Evidence, his right
to due process as guaranteed by the Fifth Amendment to the United States Constitution, (20) and
his right to a fair trial as guaranteed by the Sixth Amendment to the United States
Constitution.

 In points of error three and four, the appellant makes a global, broad-based assertion
that the trial court erred by taking judicial notice of the relevance and reliability of psychiatric
and psychological expert testimony on the issue of future dangerousness, rather than
performing an independent "gatekeeping" function and making an independent determination
as to whether a psychiatric or psychological expert could ever offer an opinion on future
dangerousness that would be sufficiently relevant and reliable. However, the trial court did
not abuse its discretion by taking judicial notice of the general relevance of such testimony. 
This Court has repeatedly held that testimony from mental-health experts is relevant to the
issue of future dangerousness. (21) Furthermore, contrary to the appellant's assertion, the trial
court did not take judicial notice of the reliability of the State's expert's testimony in this
particular case; rather, the court held a hearing before making that determination. Points of
error three and four are overruled.

 In points of error five, six, and seven, the appellant asserts that the trial court erred in
finding that the future-dangerousness testimony of the State's expert in this case, Dr. Edward
Gripon, was based on scientifically valid reasoning or methodology. A trial court's ruling
on the admissibility of scientific expert testimony is reviewed under an abuse of discretion
standard. (22) When "soft" sciences are at issue, the trial court should inquire: (1) whether the
field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony
is within the scope of that field, and (3) whether the expert's testimony properly relies on or
utilizes the principles involved in the field. (23)

 Prior to Gripon's testimony at trial, the trial court held a hearing to determine the
reliability of his testimony. At the hearing, Gripon testified that he was a medical doctor with
a specialty in psychiatry and board certifications in general and forensic psychiatry. He had
performed forty to fifty future-dangerousness case evaluations and had testified on the issue
of future dangerousness many times. He further testified that determinations of future
dangerousness are a legitimate function of forensic psychiatrists. He related that forensic
psychiatrists typically rely on interviews, when allowed, and all of the collateral information
available, to develop a profile of the person. The best predictor of future dangerousness
would be the person's past history. Gripon testified that actuarial methods involved looking
at how often things occurred in the death-row population versus the population of others
convicted of murder. Gripon acknowledged that there was not one method of performing a
future-dangerousness evaluation that was accepted as always right.

 Gripon described his method as obtaining "every shred of information" he could get
and then fitting it into a "mental health jigsaw puzzle" to see what it looked like. This
method was a combination of a clinical assessment and the actuarial method. He would then
determine whether he had enough information to feel comfortable in offering an opinion. 
In this case, he had reviewed the appellant's juvenile records, criminal records, offense
reports, jail records, and audio recordings of four telephone calls the appellant had placed
from jail. He also interviewed the appellant, but he did not discuss the results of that
interview. He testified that he had not attempted to investigate beyond the materials
furnished by the State because he felt that those materials were enough to enable him to offer
an opinion. The trial court accepted him as an expert.

 Based on the record before us, we find the reliability of Gripon's testimony to be
sufficiently established under Nenno and Rule 702. Thus, we conclude that the trial court
did not abuse its discretion in admitting the expert testimony on future dangerousness. Points
of error five, six, and seven are overruled.

JURY INSTRUCTIONS CONCERNING MITIGATION

 In point of error eight, the appellant complains that the trial court reversibly erred by
instructing the jury that mitigating evidence was evidence that reduced his moral
blameworthiness. The trial court did not err in giving this instruction, which was required
by Article 37.071 of the Texas Code of Criminal Procedure. (24) We have previously rejected
a challenge to the constitutionality of this instruction. (25) Point of error eight is overruled.

 In point of error nine, the appellant asserts that the jury should have been instructed
that mitigating evidence does not require a nexus between the evidence and the commission
of the crime. However, the appellant has not identified any alleged mitigating evidence that
could not be given effect under the instructions that were given. (26) The mitigation instruction
permitted the jury to give full effect to the mitigating evidence. (27) Point of error nine is
overruled.

THE 10-12 RULE

 In point of error ten, the appellant asserts that the 10-12 rule is unconstitutional, as
well as arbitrary and capricious, because it may arbitrarily force the jury to continue
deliberating after every juror voted to answer a special issue in favor of the appellant, and
it fails to inform the jurors that a sentence of life will result unless all 12 jurors answer "Yes"
to future dangerousness and "No" to mitigation. We have previously rejected these
arguments. (28) Point of error ten is overruled.

 We affirm the judgment of the trial court.


Delivered: June 17, 2009

Do Not Publish
1. Tex. Penal Code § 19.03(a)(2).
2. Art. 37.071, § 2(g). Unless otherwise indicated all references to Articles refer to the Code
of Criminal Procedure.
3. Art. 37.071, § 2(h).
4. Hearn testified at trial that he had never conducted a gun line-up before, and he added the
borrowed rifle to the collection in an effort to duplicate the controls typically used in a suspect line-up.
5. Gribble v. State, 808 S.W.2d 65, 71 (Tex. Crim. App. 1990) (plurality opinion) (observing
that "the [corroboration or corpus delicti] rule peremptorily reduces the weight of admissible
evidence for policy reasons originated by this Court without express legislative sanction," and so the
quantum of independent corroborating evidence need not be great).
6. Cardenas v. State, 30 S.W.3d 384, 390 (Tex. Crim. App. 2000). It has been suggested that
we should renounce the rule that in prosecutions brought under Section 19.03(a)(2) of the Penal
Code, Tex. Pen. Code § 19.03(a)(2), both murder and underlying felony must be corroborated. 
Although the rule originated in a plurality opinion, Gribble v. State, supra, it has since been endorsed
by a clear majority of the Court on a number of occasions. Chambers v. State, 866 S.W.2d 9, 15
(Tex. Crim. App. 1993); Emery v. State, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994); Williams
v. State, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); Rocha v. State, 16 S.W.3d 1, 4-5 (Tex. Crim.
App. 2000); Cardenas v. State, supra. Because we will hold that the evidence in this case does
corroborate at least one of the underlying felonies, there is no need to address the question whether
we should renounce the rule, and hence, disavow those post-Gribble majority opinions in our
unpublished opinion in this case. The parties here have not briefed the question. Better to save it
for a later day when it has been specifically briefed by the parties and it might make a difference to
the ultimate resolution of the appeal.
7. McDuff v. State, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).
8. Salazar v. State, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002).
9. Id.
10. The jury was charged:


Even though you should find from the evidence beyond a reasonable doubt that the
defendant admitted that he committed the offense, if any, that such admission
standing alone is not sufficient to authorize a conviction in the case.


Now, therefore, unless you find and believe that there is other evidence before you,
which taken with the alleged statement of the defendant, convinces you beyond a
reasonable doubt that the defendant is guilty as charged in the indictment, you will
acquit the defendant and say by your verdict "Not Guilty."
11. See Cardenas, 30 S.W.3d at 391; see also Kitchens v. State, 823 S.W.2d 256, 259 (Tex.
Crim. App. 1991) (quoting Turner v. United States, 396 U.S. 398, 420 (1970)).
12. See, e.g., Gribble, 808 S.W.2d at 72.
13. During the missing-person investigation, law-enforcement officials had deliberately withheld
Leal's report about the stolen money as a way to verify the reliability of anyone who might claim to
have personal knowledge of Townsend's disappearance.
14. Jackson v. Virginia, 443 U.S. 307 (1979).
15. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App.), cert. denied, 128 S. Ct. 282 (2007)
(citing Watson v. State, 204 S.W.3d 404, 414-415 (Tex. Crim. App. 2006)).
16. Watson, 204 S.W.3d at 417.
17. Gribble, 808 S.W.2d at 68.
18. See Fisher v. State, 851 S.W.2d 298, 304 (Tex. Crim. App. 1993).
19. Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998).
20. In the interest of justice, we assume that the appellant intends to invoke his right to due
process as guaranteed by the Fourteenth Amendment. See, e.g., Washington v. Texas, 388 U.S. 14,
18 (1967); Ex parte Madding, 70 S.W.3d 131, 136 (Tex. Crim. App. 2002).
21. See Nenno, 970 S.W.2d at 561; see also Russeau v. State, 171 S.W.3d 871, 884 (Tex. Crim.
App. 2005) (citing Griffith v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998)).
22. Russeau, 171 S.W.3d at 881.
23. Id. at 883-884.
24. See Art. 37.071, § 2(f)(4).
25. See Lucero v. State, 246 S.W.3d 86, 96 (Tex. Crim. App.), cert. denied, 129 S.Ct. 80 (2008).
26. See Roberts, 220 S.W.3d at 534.
27. See Perry v. State, 158 S.W.3d 438, 448-49 (Tex. Crim. App. 2004); see also Jackson v.
State, 992 S.W.2d 469, 481 (Tex. Crim. App. 1999).
28. See, e.g., Druery v. State, 225 S.W.3d 491, 509 (Tex. Crim. App.), cert. denied, 128 S. Ct.
627 (2007); Russeau, 171 S.W.3d at 886.