

NUMBER 13-14-00379-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**VORICE CHARLES CITIZEN A/K/A
VORICE C. CITIZEN,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

---

### On appeal from the Criminal District Court
### of Jefferson County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Garza

A Jefferson County jury convicted appellant, Vorice Charles Citizen, of indecency with a child by contact, a second-degree felony. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (West, Westlaw through 2013 3d C.S.). The jury found an enhancement paragraph true and assessed punishment at 36 years' imprisonment and a $10,000 fine. *See id.*

§ 12.42(b) (West, Westlaw through 2013 3d C.S.). Citizen raises eleven issues challenging his conviction. We affirm.[1]

## I. BACKGROUND

The indictment alleged that Citizen, on or about December 28, 2012, touched the genitals of R.W., a child under the age of seventeen and not Citizen's spouse, with the intent to arouse and gratify his sexual desire. *See id.* § 21.11(a)(1), (c)(1).

At trial, R.W. testified that she is thirteen years old and in the seventh grade. Since she was six years old, her legal guardian has been her grandmother Laura King. R.W. testified that, around New Year's Day of 2013, she called the police because her aunt, JaLeisa, had gotten into a fight with Citizen, JaLeisa's long-term boyfriend. R.W. stated that she called the police because she thought JaLeisa "was going to get shot." R.W. explained that she was staying at JaLeisa's house over the Christmas break with her two siblings and two cousins. When the prosecutor asked what happened, R.W. replied:

A. He—everything was going good and he came in the house with an attitude and I think he had a printer or something in his hand and he slammed it down on the table and then him and my auntie had got into a big argument. And all I heard her say was, "You're not taking my son nowhere with you." And then I had went with the rest of the kids and then I heard a bang against the wall and she had came out the room and she had grabbed a knife and then when she went back, she was just like, "Stop hitting me. Stop hitting me." And then I heard a gun cock and she was like, "So, what? You going to shoot me now?" And that's when I called the police.

Q. Now, when you heard all of this going on, were you gathering the kids to get them out to protect them?

A. Yes, sir. I had made them all come in the restroom with me and that's when I locked the door and I called the police.

---

[1] This appeal was transferred from the Ninth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

The prosecutor then asked R.W. about what happened "the days before" between R.W. and Citizen:

A. First, me, my cousin—no. Me, his daughter—I call her my cousin— and my two little brothers, we had got in trouble because a soda, a Dr. Pepper, was on the TV stand; and they didn't know who drunk it.

. . . .

Q. You-all got in trouble for drinking a soda when you didn't ask for one?

A. Yes, sir.

Q. Now, what does that—you're not supposed to do that?

A. No, sir.

Q. What are you supposed to do?

A. Ask for what we want.

Q. Okay. So, that didn't happen; and you-all got in trouble?

A. Yes, sir.

Q. Now, who was there at the time you-all got in trouble?

A. My auntie.

Q. Now, what happened? Did your auntie discipline you or how did you-all get in trouble?

A. She just told us next time ask for it.

Q. So, you-all didn't get punished?

A. No, sir.

Q. You-all didn't get like a spanking or time out or anything like that?

A. No, sir.

Q. So, what happened next?

A. When [Citizen] came home [at least three or four hours later], I guess—we was all in the room playing and he came up in there and he called us all to the living room and he was like, "Who drunk the soda?" And everybody kept saying that they don't know. So, he

3

made us go get on our knees for a long time. . . . He made us each take a corner up in the room, and we had to stay on our knees for a good little bit.[2] . . . After we was on our knees for a while, he also made us sit in a chair position on the wall for a long time while he played the game.

Q. When you say "sit in a chair position," what does that mean? You're talking about sitting on a wall? Like if I was to do this, sit on a wall like that?

A. And put your arms straight out.

Q. Straight out. You can't put your arms on your knees, right? Is that comfortable?

A. Huh-uh.

Q. It hurts, right?

A. Yes, sir.

Q. Okay. Now, what happened next?

. . . .

A. We kept on falling. So, we had to go get back on our knees again.

Q. Okay.

A. And maybe at least 30 minutes after, he started calling us all to [JaLeisa's bedroom] by ourselves.

. . . .

Q. One by one he called you into that room?

A. Yes, sir.

Q. And did he shut the door?

A. Yes, sir.

Q. Okay. And why did he say he was calling you in there? Did he tell you-all?

---

[2] R.W. stated that Citizen had never punished her before, and she thought it was weird that he was punishing her because "usually when me or my brothers get in trouble, he leave[s] it to my auntie to handle us."

4

A.     No, sir.  He just started calling us.

R.W. testified that Citizen called her into JaLeisa's room last because she was the oldest of the children.  She stated she had never been alone in a room with him before.  She stated that Citizen was standing with one hand on the knob of the closed bedroom door and one hand on his hip.  R.W. testified:

> First, he started asking me questions about the soda.  So, I would just turn and play with a Christmas card that was on top of the TV.  And he started asking me questions and I was just like "yes, sir" and "no, sir."  And then he said, "Give me a hug."  And I was like—I use one hand to give him a hug.  And he was like, "Do you still want to be out of trouble?"  And I said, "yes, sir." . . .  He was like, "First, you got to give me a kiss."  And then I didn't give him a kiss and then . . . [a]fter that, he had took the right—no.  Yeah— left hand off his hip and cupped it and went upwards on my vaginal area and I pushed back.  And then he was like, "Okay.  You can go now."  And he opened the door.  When I was walking out, he said, "Hold on.  Come see." And then I came back in the room and he closed it again and he told me that if I was to tell anybody, he was going to shoot my auntie, the kids and everybody else in my family that he knew. . . .  And he looked at the dresser—when he was telling me that, he looked at the top drawer that had his gun in it.

R.W. confirmed that she was wearing shorts and a T-shirt at the time, and the touching occurred on the outside of her clothes.  R.W. stated that the touching lasted a short time— "[a]t least two seconds"—but that it made her uncomfortable and she did not think it was an accident.  She agreed that she then "pushed [Citizen] away."  When the prosecutor asked if Citizen "rub[bed] on [her]," R.W. replied:  "It was just a cupped hand upwards." The prosecutor then asked:  "And did you know if he was doing that because he wanted to, like, gratify himself sexually?"  R.W. replied:  "Yes, sir."

R.W. stated she knew that Citizen's top dresser drawer had a gun in it "[b]ecause one day when I was playing on the bed, I was standing on top of it and he opened the dresser and he pulled it out and he put it in his pocket."  She said she did not tell anyone in her family about the touching because she was worried about Citizen's threat.  "At least

5

two days later," when Citizen and JaLeisa got into a fight, R.W. called the police. When police arrived to investigate, after they escorted Citizen out of the house, R.W. reported the touching.

On cross-examination, defense counsel advised R.W. that, according to the police report of the incident, she had told police that Citizen made the children sit on their knees "for three hours" but did not mention sitting against the wall. R.W. confirmed that they sat on their knees for three hours but stated she forgot to mention sitting against the wall. R.W. also conceded that she told police Citizen had touched her "main area"; she clarified on re-direct examination that "main area" meant "vaginal area." When defense counsel asked "So, when was it that you all of a sudden didn't become afraid anymore?", R.W. replied: "When the police had finally escorted him out of the house."

Officer Christopher Daniels of the Beaumont Police Department was called to testify next by the State. Defense counsel objected to Daniels's proffered testimony as hearsay and as unfairly prejudicial. Counsel further argued that admission of Daniels's testimony violated Citizen's constitutional right to confrontation and that the State did not comply with the notice provisions of article 38.072 of the code of criminal procedure, regarding outcry statements. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b) (West, Westlaw through 2013 3d C.S.). The trial court, noting that the issue had already been determined at a pre-trial hearing, overruled the objections.

Daniels testified that he responded to a call reporting a "disturbance between a boyfriend and girlfriend" and that one of the suspects had a firearm on his person. He stated he and another officer entered the apartment and drew their weapons. They found Citizen and JaLeisa arguing and confiscated Citizen's handgun. Citizen was "very

6

compliant" with police. JaLeisa, who had suffered minor injuries to her face, reported that Citizen threatened her with a gun.[3]

Daniels stated that he talked to R.W., who was twelve years old at the time of the incident, after Citizen was taken to the officers' patrol unit. Daniels was asking R.W. about the fight between Citizen and JaLeisa when R.W. "made an outcry" of "sexual indecency." Daniels testified:

> [R.W.] basically said that the kids got in trouble over a soda and he made them line up at the door individually and come in there by themselves and she was the last one. When she was the last one that walked in there, he asked her about the soda and then he started taking his hand and rubbing her vaginal area and she pushed him off. And he then asked, "If you want to be out of trouble, you can give me a kiss." And, you know, and that's pretty much what he did; and I don't believe she kissed him, if I remember. . . . She did say that he threatened to kill her and her family if she ever came out and made an outcry to anybody in the family about this incident.

Daniels testified that R.W. seemed "very calm" and "sincere" when making the statement. He reported the outcry to his supervisor.

Kenya Fontnett, a Child Protective Services ("CPS") investigator, testified that she interviewed R.W., R.W.'s aunt, and her two siblings. According to Fontnett, R.W. was "very scared" initially but "was very forthcoming" with information about what happened. Pursuant to information obtained in the interviews, the children were removed from the household for their safety. The prosecutor then asked, over defense counsel's objections, whether R.W.'s reports to Fontnett were consistent with the outcry statement she made to police. Fontnett replied, "Yes."[4] Nancy Blitch, who works for CPS at the Garth House

---

[3] According to Daniels, JaLeisa "refused to file charges against [Citizen] for the assault but by the State, I can file assault family violence and I filed that on him and I brought him to the Jefferson County Jail."

[4] Fontnett also testified that Citizen came to speak with her voluntarily and that "he was very hesitant on answering the questions specifically that I asked him. At the end, he began to cry. He was

7

Children's Advocacy Center in Beaumont, testified that she interviewed R.W. on January 8, 2013. Blitch stated that R.W. was "able to give a narrative" and was "very consistent" when asked follow-up questions. Blitch stated that R.W.'s statements to her were consistent with the initial outcry report. Detective Charles Duchamp of the Beaumont Police Department also testified that he was present during R.W.'s interview with Blitch and that R.W.'s statements during the interview were consistent with her prior outcry.

In Citizen's defense, JaLeisa testified that, on the morning in question, she left a soda can on her TV stand "for me to drink when I woke up the next morning because when I wake up, I'm always dehydrated and it was gone and I asked who drunk it. No one said the truth who did it. So, I punished them by putting them on their knees." JaLeisa said "[t]hey were off and on their knees throughout the day." At some point in the afternoon, Citizen came home. JaLeisa testified:

> He first talked to his own daughter, my stepdaughter, to see what happened, why they were in trouble. And one by one, he called them in the room; and I'm standing behind the couch in the living room. And into our bedroom from my living room, you can see where he was standing; and where she was standing and the way they were standing, I could see him at all times and the child at all times. . . . He asked them—he asked each child who drunk the soda. Nobody still hadn't said who done it and after he would talk and ask who done it, he would send each child back to get back on their knees while he had them in their room. . . . [T]he whole time he was talking to [R.W.], I could see him and her. Because of how our room is, I could see straight into our bedroom from my living room. . . . He asked her who drunk the soda; and just like all the rest of the children, she said she didn't know. I didn't know there was a soda under the TV. Nobody said anything about who drunk it. So, he sent her back into the room with the other children to get back on her knees.

When defense counsel asked JaLeisa why R.W. "would . . . make something like that up,"

---

hunched over, and I really didn't get a lot of specifics on what I was asking him." On cross-examination, Fontnett agreed with defense counsel that Citizen might have been crying because they had been discussing the recent death of his mother.

JaLeisa responded: "It's pretty unsure for me, but this isn't the first time she's said anything like this. This is her second time saying something like this has happened. It's just never been this far before."

Citizen testified that when he came home on December 28, 2012, JaLeisa told him "what happened with the situation about the soda." He stated the children were already on their knees as punishment when he arrived. He stated: "So, I started calling [them] in the room one by one; and I spoke with them and ask them about who drunk the soda." R.W. was the last one to be called in. Citizen testified:

> When she came in the room, she stood by the bed. . . . And I was standing at the door holding the door with my right hand and it was partially open and she was standing by the bed and I was asking her about the soda. . . . [JaLeisa] was standing in the front room like enough to see into the room. . . . After I talked to her and asked her about who drunk the soda, she didn't admit to it either. So, I was like okay. I sent her back in her room to get on her knees.

Citizen denied hugging R.W, asking R.W. to kiss him, or touching R.W. inappropriately. He did not know why R.W. "would say that [he] did something [he] didn't do."

The jury convicted Citizen as charged. Citizen filed a motion for new trial alleging that (1) "new evidence" was discovered which should have been admitted at trial, and (2) the evidence was legally insufficient to show that Citizen "touched" R.W.'s genitals. The trial court denied the motion without a hearing, and this appeal followed.

## II. DISCUSSION

Citizen raises the following issues on appeal: (1) he received insufficient notice of Daniels's outcry testimony; (2) the insufficient notice of Daniels's testimony violated his due process rights; (3) admission of Fontnett's testimony regarding Citizen's and R.W.'s statements to her violated his Fifth and Sixth Amendment rights; (4) admission of Blitch's testimony regarding R.W.'s statements to her violated his Sixth Amendment right to

9

confrontation; (5) admission of Duchamp's testimony regarding R.W.'s statements to him violated his Sixth Amendment right to confrontation; (6) his Sixth Amendment right to confrontation was violated because "various" witnesses confirmed R.W.'s testimony; (7) the testimony of Fontnett, Blitch, and Duchamp was inadmissible because it was used "mainly to bolster the credibility" of R.W.'s outcry; (8) he was entitled to a hearing on his motion for new trial "calling for evaluation of R.W.'s competency to testify" because the trial court did not hold such a hearing before trial, nor did it hold a "statutorily required reliability of outcry hearing"; (9) he was entitled to a new trial on the basis of newly discovered evidence; (10) he was entitled to a new trial because the trial court failed to hold a "statutorily required reliability of outcry hearing" and failed to hold a hearing to evaluate "R.W.'s competency to testify"; and (11) the evidence was legally insufficient to support the jury's guilty verdict.

## A.    Admissibility of Daniels's Outcry Testimony

By his first, second, and tenth issues, Citizen challenges the admissibility of Daniels's testimony of R.W.'s outcry of sexual contact under article 38.072 of the Texas Code of Criminal Procedure.  Article 38.072, section 2(b), provides:

> A statement that meets the requirements of Subsection (a) is not inadmissible because of the hearsay rule if:
>
> (1)    on or before the 14th day before the date the proceeding begins, the party intending to offer the statement:
>
> (A)    notifies the adverse party of its intention to do so;
>
> (B)    provides the adverse party with the name of the witness through whom it intends to offer the statement; and
>
> (C)    provides the adverse party with a written summary of the statement;

10

> (2)     the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement; and
>
> (3)     the child . . . testifies or is available to testify at the proceeding in court or in any other manner provided by law.

TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b) (West, Westlaw through 2013 3d C.S.).

Section 2(a) of the statute states that its provisions apply only to statements that:

> (1)     describe . . . the alleged offense . . . ;
>
> (2)     were made by the child against whom the charged offense . . . was allegedly committed; and
>
> (3)     were made to the first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the offense . . . .

*Id.* art. 38.072, § 2(a).  It is undisputed that R.W.'s outcry to Daniels satisfies all elements of section 2(a).

At a pre-trial hearing on June 2, 2014, defense counsel argued that Daniels's testimony was inadmissible because:  (1) it is hearsay not in compliance with article 38.072, *see id.*; (2) it is irrelevant, *see* TEX. R. EVID. 402; (3) it violates Citizen's right to confrontation; (4) its probative value is outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence, *see* TEX. R. EVID. 403; and (5) it is not based on Daniels's personal knowledge, *see* TEX. R. EVID. 602.  The trial court overruled the objections.[5]  On appeal, Citizen argues only that Daniels's testimony was inadmissible

---

[5] The trial court reasoned as follows:

I do find that the State from the arguments and the information given to me, that the State has complied with the spirit of the statute . . . .  But I don't find surprise; and I don't find that the statute is violated if we go forward within the 14 days of the date that he has given this newer, official notice of use.  I think back in May a year ago, that 14 days started; and from what I've read, it's pretty clear that that's the only outcry that's mentioned in that report.  It's authored by the person and you've had over a year to go talk to him if you wanted to, but you certainly knew it was the elephant in the room when it came to that piece of evidence.  So, I would overrule you[r] objection for use.

11

because the State failed to provide timely notice under section 2(b)(1) of article 38.072, and because it failed to conduct a reliability hearing under section 2(b)(2) of that article. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(1), (2).

We review the admission of evidence under an abuse of discretion standard. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). A trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

### 1.     Notice

By his first issue, Citizen argues that Daniels's testimony was inadmissible because the State did not provide fourteen days' notice as required by section 2(b)(1) of article 38.072. *See id.* art. 38.072, § 2(b)(1). He argues by his second issue that the insufficient notice deprived him of his constitutional due process rights. *See* U.S. CONST. amends. V, IV.

At the pre-trial hearing, the parties appeared to agree that the State first provided formal notice of its intention to call Daniels to testify as to R.W.'s outcry on May 30, 2014, only three days before trial was scheduled to begin. The prosecutor noted that he was new to the case and filed notice "as quickly as I determined that that was not filed in this case."[6] The State argued, at the hearing and on appeal, that Daniels's testimony is nevertheless admissible because: (1) the State provided the required notice by serving full discovery, including copies of police and CPS reports, to defense counsel more than a year prior to trial; and (2) even if the provision of full discovery is not considered timely

---

[6] The prosecutor later argued at the hearing that he provided formal notice on May 30, 2014 only "out of an abundance of caution."

notice for purposes of the rule, Citizen did not show that he was harmed by the lack of timely notice.

We find that the State failed to provide notice as required by the statute. Here, as the State notes, copies of police and CPS reports were provided to defense counsel more than a year before trial. However, there appears to be no dispute that the police report, which was authored by Daniels, detailed the allegation of assault against Citizen, not the allegation of sexual contact. During the pre-trial hearing, the trial court quoted a statement from the police report, authored by Daniels, which read: "While speaking to the complainant, she made an outcry to me about being improperly touched by defendant."[7] Even if we were to consider this offhand remark a "written summary of the [outcry] statement" as required by the statute, *see* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(1)(C), there is no evidence that the State timely "notifie[d Citizen] of its intention" to call Daniels to testify as to R.W.'s outcry. *See id.* art. 38.072, § 2(b)(1)(A). The trial court erred in finding that the State provided notice of Daniels's outcry testimony under article 38.072.

### 2. Reliability Hearing

Citizen argues by his tenth issue that "one mandatory purpose of the pre-trial hearing that was staged should have been to determine the reliability of the outcry statement."[8] We construe this argument as a challenge to the admissibility of Daniels's

---

[7] The police and CPS reports which were provided to defense counsel were not entered into evidence during the pre-trial hearing or at trial and thus do not appear in the record before this Court.

[8] Citizen makes this argument within the discussion of his tenth issue, which is titled as follows:

The trial court abused its discretion by denying appellant's motion for new trial calling for evaluation of R.W.'s competency to testify, where the court did not hold such a hearing before trial, nor did it hold the statutorily-required reliability of outcry hearing designed to determine such competency.

13

testimony on the basis that a reliability hearing was not held as required by article 38.072. *See id.* art. 38.072, § 2(b)(2) (providing that an outcry statement is not inadmissible because of the hearsay rule if, among other things, "the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement").

The parties agree, and the record confirms, that the June 2, 2014 pre-trial hearing dealt only with whether the State's notice of Daniels's testimony was sufficient; the parties never discussed whether R.W.'s outcry was reliable "based on the time, content, and circumstances of the statement." *See id.* The State argues that Citizen waived appellate review of the issue because, though defense counsel objected to Daniels's testimony on hearsay grounds, he did not request an article 38.072 reliability hearing, nor did he specifically object to the lack of such a hearing. The State cites *Norris v. State*, 788 S.W.2d 65, 68 (Tex. App.—Dallas 1990, pet. ref'd), and *Cisneros v. State*, 692 S.W.2d 78 (Tex. Crim. App. 1985), two cases which stand for the axiomatic proposition that error in the admission of evidence is waived absent a timely objection. *See* Tex. R. App. P. 33.1.

A complaint regarding the failure to hold a reliability hearing under article 38.072 is forfeited if it is not raised at trial *and* if there is no objection to the outcry testimony. *See Laredo v. State*, 194 S.W.3d 637, 640–41 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *State v. Kaiser*, 822 S.W.2d 697, 702 (Tex. App.—Fort Worth 1991, pet. ref'd); *see also Williams v. State*, No. 02-10-00118-CR, 2011 WL 1601290, at *6 (Tex. App.—Fort

---

In light of our conclusions herein that Citizen preserved this issue for appeal by making a general hearsay objection at trial and that the trial court erred in admitting Daniels's testimony, we need not determine whether the trial court erred in denying Citizen's motion for new trial on this basis. *See* Tex. R. App. P. 47.1.

14

Worth Apr. 28, 2011, pet. ref'd) (mem. op., not designated for publication). However, the Texas Court of Criminal Appeals has held that a "general" hearsay objection is sufficient to preserve a complaint on appeal that a trial court did not hold an article 38.072 reliability hearing. *Long v. State*, 800 S.W.2d 545, 548 (Tex. Crim. App. 1990) (noting that the provisions of article "are mandatory, and must be complied with in order for a statement to be admissible over a hearsay objection" and that, once appellant made a hearsay objection, "[t]he burden then became the State's to show the evidence was admissible pursuant to either the provisions of [article] 38.072 or to some other exception to the hearsay rule"); *but see Cates v. State*, 72 S.W.3d 681, 698 (Tex. App.—Tyler 2001, no pet.) (holding that any error in failing to hold an article 38.072 reliability hearing was waived, even though appellant objected to outcry testimony at trial on the basis of hearsay, because "[a]ppellant did not request a 38.072 hearing").

Here, defense counsel made the following objections when the prosecutor called Daniels to testify at trial:

> I object to any questions or answers that have to do with an outcry of this witness. I think it violates my client's constitutional right of confrontation under the 14th Amendment of the United States Constitution, Article 10 and 19 of the Texas Constitution. It is—even though relevant, I also object because even though it is relevant, it is—there is a danger—the probative value is substantially outweighed by the danger of unfair prejudice basically and cumulative and unnecessary evidence since the victim already testified to anything that the outcry witness may state.
>
> He'd also be in violation of the Texas Rules of Evidence that has to do with somebody who testifies based on their personal knowledge and it's hearsay and is not—and also, that it violated the notice provisions of 38.072 of the Texas Code of Criminal Procedure.

Defense counsel lodged a specific objection to the lack of timely notice under article 38.072; but also objected generally on the basis of hearsay. This "general" hearsay objection was sufficient to preserve the issue raised on appeal. *See Long*, 800 S.W.2d

15

at 548. And, given that the State bore the burden to show admissibility under article 38.072 once Citizen made a hearsay objection, *see id.*, we conclude that the trial court erred by failing to hold an article 38.072 reliability hearing.

The State did not meet its burden to show admissibility of Daniels's outcry testimony under article 38.072 because it did not (1) provide timely notice of its intention to call Daniels as a witness to testify as to R.W.'s outcry, or (2) ensure that a hearing was held at which the trial court could have evaluated whether R.W.'s outcry to Daniels was "reliable based on the time, content, and circumstances of the statement."[9] TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2). The trial court therefore erred in admitting the testimony.

### 3. Harm Analysis

Even though the trial court erred in admitting Daniels's testimony, we will not reverse on that basis unless the error caused Citizen to suffer harm. TEX. R. APP. P. 44.2. In determining whether an appellant was harmed by lack of timely notice under 38.072, we determine if the failure to provide timely notice caused appellant to be actually surprised by the outcry evidence and whether the failure prejudiced appellant. *Zarco v. State*, 210 S.W.3d 816, 832 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (noting that "[t]he purpose of article 38.072 is to prevent surprise at trial by the admission of outcry testimony"); *Gabriel v. State*, 973 S.W.2d 715, 719 (Tex. App.—Waco 1998, no pet.); *Garcia v. State*, 907 S.W.2d 635, 638 (Tex. App.—Corpus Christi 1995), *aff'd on other*

---

[9] The State did not argue, when it called Daniels to testify at trial, that Daniels's testimony was non-hearsay under Texas Rule of Evidence 801(e)(1)(B). *See* TEX. R. EVID. 801(e)(1)(B) (providing that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive").

*grounds*, 981 S.W.2d 683 (Tex. Crim. App. 1998). Here, defense counsel expressed at the pre-trial hearing that he was "ready to go to trial" and stated: "Irrespective of whether or not I may or may not have known the substance of what they were complaining about, I think that they have to follow the rule." Defense counsel did not allege at the hearing that the lack of timely notice surprised Citizen or prejudiced his defense.[10] It is also noteworthy that the prosecutor asked for a continuance of the trial to allow Citizen fourteen days' notice in the event that the trial court found that such notice had not been provided.

In any event, the erroneous overruling of an objection to evidence will not result in reversal when other such evidence is received without objection, either before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)[11]; *Wagner v. State*, 109 S.W. 169, 169 (Tex. Crim. App. 1908) ("It is well settled in this state that the erroneous admission of testimony is not cause for reversal, if the same fact is proven by other testimony not objected to."); *see* TEX. R. APP. P. 44.2. This rule has been

---

[10] On appeal, Citizen notes that formal notice under article 38.072 must contain a summary of the outcry statement to be offered, TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(1)(C), and he contends that he

> was harmed by the lack of notice because, among others, defense counsel did not know at trial that he could show that R.W. had been alone with Appellant a large number of times before . . . , despite R.W.'s testimony to the contrary, because he did not know what would be specifically offered as outcry before he received the May 30th Notice.

Citizen appears to be referring to an affidavit by King, filed with Citizen's motion for new trial, in which King purported to "know personally" that R.W. had "been alone together" with Citizen on "numerous" prior occasions. Citizen does not explain, though, how timely formal notice of *Daniels's* outcry testimony, as required by article 38.072, would have brought this apparent conflict to his attention. Daniels did not testify at trial that R.W. told him she had never been alone with Citizen before, so there is no reason to think that a formal written summary of R.W.'s outcry statement to Daniels would have included that information.

[11] In *Leday*, the Texas Court of Criminal Appeals set forth two exceptions to this general rule: (1) where "the defendant's testimony, which constituted other evidence of the fact that was proved over the defendant's objection, was impelled by the State's introduction of evidence that was obtained in violation of the law"; and (2) where "the harmful effect of improperly admitted evidence is not cured by the fact that the defendant sought to meet, destroy, or explain it by introducing rebutting evidence." *Leday v. State*, 983 S.W.2d 713, 718–19 (Tex. Crim. App. 1998). Neither exception is applicable here.

17

applied in the context of an outcry of sexual abuse made by a child. *See Zarco*, 210 S.W.3d at 833 (holding that the erroneous admission of an officer's testimony as to a child's outcry of sexual abuse was harmless in part because the child "testified in detail about the abuse" and "detailed the same testimony [the officer] gave regarding the abuse" without objection). Here, Daniels's testimony regarding R.W.'s outcry established exactly the same facts as R.W.'s direct testimony regarding the events at issue.

For the foregoing reasons, we find that the admission of Daniels's testimony, though erroneous, was harmless. *See Leday*, 983 S.W.2d at 718; *Zarco*, 210 S.W.3d at 833; *see also* TEX. R. APP. P. 44.2.[12] We overrule Citizen's first, second, and tenth issues.

## B. Right to Confrontation

By his third through sixth issues, Citizen argues that the trial court erred, violating his right to confrontation under the Sixth Amendment, by admitting testimony by Fontnett, Blitch, and Duchamp that the reports made by R.W. in her police and CPS interviews were consistent with R.W.'s trial testimony.[13] The United States and Texas Constitutions provide that an accused has the right "to be confronted with the witnesses against him" in a criminal prosecution. U.S. CONST. amends. VI, XIV; *see* TEX. CONST. art. I, § 10. Consistent with this guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*,

---

[12] Citizen does not cite any authority, and we find none, establishing that failure to comply with article 38.072 is "constitutional error" subject to a more stringent harm analysis under the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(a).

[13] Citizen also suggests that the admission of testimony by Fontnett regarding her interview with him violated his Fifth Amendment right against self-incrimination. *See* U.S. CONST. amend. V. However, he does not support this argument with authority; accordingly, it is waived. *See* TEX. R. APP. P. 38.1(i).

541 U.S. 36, 59 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).[14]

Citizen does not direct us to any location in the record, and we find none, where defense counsel objected to the testimony of these witnesses on Confrontation Clause grounds. To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint. TEX. R. APP. P. 33.1; *see Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009). Citizen argues, without citation to authority, that "[t]o any extent that [defense counsel] did not preserve error by objecting, error is still preserved by virtue of the design of the Sixth Amendment to abolish such inquisitorial proceedings by making structural error unwaivable." But is well established that even constitutional and statutory rights may be waived by failure to object. *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) ("Because he did not object to error under the Confrontation Clause, appellant waives this argument on appeal"). Citizen does not cite any authority establishing that Confrontation Clause error is "structural error" that need not be preserved in the trial court. *Cf. Marin v. State*, 851 S.W.2d 275, 278–79 (Tex. Crim. App. 1993) (noting that the rights to assistance of counsel and to jury trial are examples of rights "so fundamental to the

---

[14] In its appellee's brief, the State does not address the right to confrontation or *Crawford*. Instead, the State argues that the three witnesses did not testify "as to the content of R.W.'s outcry" but rather testified "as to the veracity of R.W.," which is an issue that Citizen "had brought into question through prior cross-examination." The State cites Texas Rule of Evidence 801, which provides that certain prior consistent statements are not considered hearsay. *See* TEX. R. EVID. 801(e)(1)(B). We note that, by agreeing that R.W.'s trial testimony was consistent with her police and CPS interviews, these witnesses were, for all intents and purposes, testifying as to the "content" of the outcries. In any event, hearsay and Confrontation Clause violations are separate, independent objections. *See, e.g., Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (noting that appellant's "arguments about hearsay did not put the trial judge on notice that he was making a Confrontation Clause argument" and finding that appellant waived the latter because "the trial judge never had the opportunity to rule upon this rationale"). That the testimony is not considered hearsay under Rule 801 does not, by itself, show that the testimony was admissible under the Confrontation Clause.

proper functioning of our adjudicatory process as to enjoy special protection in the system" and "are not extinguished by inaction alone"), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997).  We therefore hold that, by failing to object to the admission of the challenged testimony on Confrontation Clause grounds, Citizen failed to preserve any error. *See* TEX. R. APP. P. 33.1; *Wright*, 28 S.W.3d at 536. We overrule his third through sixth issues.

## C.    Bolstering

By his seventh issue, Citizen contends that the trial court erred "by allowing [Fontnett, Blitch, and Duchamp] to testify mainly to bolster the credibility of R.W.'s outcry version of events, despite their having been integral participants in preparation of the case for the prosecution."

The only "bolstering" objection appearing in the record was lodged by defense counsel with reference to Fontnett's testimony that R.W.'s report to her was consistent with the outcry R.W. made to police.[15]  "Bolstering" has been defined as "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993).  However, the Texas Court of Criminal Appeals has expressed skepticism as to whether "bolstering" remains viable as an independent ground of objection.  *See Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (noting that "the term 'bolstering'

---

[15] The record contains no objection by defense counsel on bolstering grounds as to Blitch or Duchamp.  Therefore, the issue has not been preserved as to these two witnesses.  *See* TEX. R. APP. P. 33.1.

is slowly dying as an objection on its face" in part because of "its inherent ambiguity," but that "it has not yet expired, despite the fact that the term itself failed to survive the adoption of the Rules [of Evidence in 1998]").

Assuming, but not deciding, that the objection remains generally cognizable, we find that it is not meritorious here. We have held that "'bolstering' is no longer a valid objection where testimony is not deemed to be hearsay." *Valencia v. State*, No. 13-10-00201-CR, 2011 WL 1900180, at *6 (Tex. App.—Corpus Christi May 19, 2011, no pet.) (mem. op., not designated for publication) (citing *Jones v. State*, 833 S.W.2d 634, 635 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd)). A statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." TEX. R. EVID. 801(e)(1)(B). Fontnett's testimony as to R.W.'s outcry was not hearsay. R.W. testified at trial and was subject to cross-examination regarding her outcries. *See id.* And, defense counsel opened the door to testimony regarding R.W.'s prior consistent statements through his opening statement and questions posed on cross-examination. First, counsel made the following remark in his opening statement:

> [T]he evidence is going to show that [R.W.] was lying but she did, in fact, tell [police] that [Citizen] had inappropriately touched her. The problem was it didn't happen, and I think that's what the evidence is going to show to you once everything is—once you've heard all the evidence.

Second, in cross-examining R.W., the following exchange occurred:

> Q. [Defense counsel] You said all that before except for the fact that you said before that you went in there and you hugged him because you always hugged him, right?
>
> A. [R.W.] I always hug him, but the only reason I hugged him at that time—

21

| Q. | Then you said that when you hugged him, that's when he touched your vaginal area and you pushed him away and then started writing on a card? |
|---|---|
| A. | (Witness shakes head negatively). |
| Q. | It didn't happen this way now? Is that what you're saying? Because you said something different earlier. Well, that's besides the point. . . . |

Third, after Daniels testified that he found Citizen and JaLeisa in the apartment's bathroom, defense counsel asked Daniels: "So, if [R.W.] said that she was in the bathroom with the kids, she was lying?"[16] Further, JaLeisa testified that "[t]his is [R.W.'s] second time saying something like this has happened."[17]

Because Fontnett's testimony was offered to rebut an express or implied charge against R.W. "of recent fabrication or improper influence or motive," it was not hearsay and the trial court did not err in overruling counsel's objection on bolstering grounds. *See id.*; *Valencia*, 2011 WL 1900180, at *6. Citizen's seventh issue is overruled.

## D. Motion for New Trial

Citizen argues by his eighth and ninth issues that the trial court erred by denying his motion for new trial. We review the denial of a motion for new trial under an abuse of discretion standard. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. *Id.* (quotation omitted). A trial judge abuses his discretion in denying a motion for new trial when no reasonable view of the record could support his ruling. *Id.*

---

[16] Daniels responded: "No. I mean, I don't know when they came out or not, sir. I don't know."

[17] There is no other evidence in the record indicating that R.W. had previously made an outcry of sexual abuse.

### 1.     Rule 601 Competency Hearing

By his eighth issue, Citizen argues that he was entitled to a new trial because the trial court failed to conduct a hearing on R.W.'s competency to testify under Texas Rule of Evidence 601.  We disagree.  A child is not considered competent to testify if he or she, "after being examined by the court, appear[s] not to possess sufficient intellect to relate transactions with respect to which they are interrogated."  TEX. R. EVID. 601(a)(2).  However, Citizen did not request a hearing to determine R.W.'s competency to testify under Rule 601, and a trial court has no obligation to *sua sponte* conduct an inquiry as to a child witness's reliability.  *McGinn v. State*, 961 S.W.2d 161 (Tex. Crim. App. 1998) ("[B]ecause appellant did not request an inquiry into [the child witness]'s competence to testify, he has forfeited the right to complain about the trial court's failure to conduct such an inquiry [under Rule 601].").  Accordingly, this issue is overruled.

### 2.     New Evidence

By his ninth issue, Citizen argues he was entitled to a hearing on his motion for new trial, and that his motion should have been granted, on the basis of "new evidence." In particular, in his motion for new trial, Citizen argued as follows:

> As the attached Affidavit of Laura King, the Grandmother and legal guardian of [R.W.], attests, [R.W.] is a child who has been diagnosed with depression and has a mental condition which causes her to co-opt adult authority figures who have just chastised her, or had a talk with her because she was in trouble about something, as had just happened between she and [Citizen] earlier on the day of the incident leading to his arrest due to her call to police. This is new evidence which should result in a new trial hearing because [R.W.], the State's only witness on the alleged abuse, should have been mentally evaluated before being allowed to testify.  Because Mrs. King was available to testify at trial, and could have shown how and where [R.W.]'s false testimony was coming from, this Motion must be granted.

King's affidavit, attached to the motion, stated in relevant part as follows:

[R.W.] has also threatened to call the C.P.S. in [sic] me before when I gave her as [sic] gentle belt whipping with a small child's belt. [R.W.] does not like adult authority figures. Anyone who tells her what she cannot do (which I understand [Citizen] had just done when [R.W.] called the police against him[]) [R.W.] will try anything to get them out of her way, and thereby have her way.

I also know personally from numerous occasions that [R.W.] had previously been alone together with [Citizen], who, among other things, would pick her up at her house and bring her to his house so she could be with my daughter [JaLeisa] and after the weekend was over, [Citizen] would bring her back home.

So, [R.W.] was lying at trial when she said she had never been alone together before with [Citizen]. And, despite her having been together with him many times before, she had never claimed that he had tried to do anything wrong which might affect her. I have also observed that [R.W.] tries to manipulate adults by playing them off against other adult authority figures.

[R.W.] has had to have therapy for depression in the past, some of it at the direction of the C.P.S. It is my opinion that [R.W.] retaliated against [Citizen] by calling the police on him, solely because he was in an argument with my daughter, [JaLeisa].

Also attached to the motion was an affidavit by Citizen's trial counsel attesting to the truthfulness of all facts alleged in the motion.

A trial court has a duty to hold an evidentiary hearing on a defendant's motion for new trial if the motion and accompanying affidavit raise an issue (1) that is not determinable from the record, and (2) on which the defendant could be granted relief. *Lucero v. State*, 246 S.W.3d 86, 94 (Tex. Crim. App. 2008). To prevent "fishing expeditions," the motion must be supported by an affidavit that explicitly sets out the factual basis for the claim. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). The affidavit does not need to establish a prima facie case or even reflect every component to obtain relief on the claim, but must merely reflect "reasonable grounds" for a court to hold that relief could be granted. *Wallace v. State*, 106 S.W.3d 103, 108 (Tex.

24

Crim. App. 2003). We review the trial court's decision on whether to hold a hearing on a defendant's motion for new trial for abuse of discretion. *Lucero*, 246 S.W.3d at 94.

Article 40.001 of the Texas Code of Criminal Procedure provides that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001 (West, Westlaw through 2013 3d C.S.). Newly discovered evidence will be considered "material" only if: (1) the new evidence was unknown or unavailable to the movant at the time of trial; (2) the movant's failure to discover or obtain the new evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Keeter v. State*, 74 S.W.3d 31, 36–37 (Tex. Crim. App. 2002). Here, neither the affidavits attached to the new trial motion nor anything else in the record indicate, explicitly or implicitly, that King's testimony was "unknown or unavailable" to defense counsel prior to trial.[18] *See id.* Moreover, King's testimony, insofar as it is relevant, appears to pertain only to R.W.'s credibility; that is, the proposed testimony is "merely . . . impeaching." *See id.* Therefore, Citizen's motion for new trial did not present "reasonable grounds" upon which relief could be granted, *see Wallace*, 106 S.W.3d at 108, and the trial court did not err in denying the motion without a hearing. We overrule Citizen's ninth issue.

## E.    Evidentiary Sufficiency

Finally, we address Citizen's eleventh issue, by which he contends that the evidence adduced at trial was legally insufficient to support his conviction. In reviewing

---

[18] Indeed, Citizen concedes that King "sat with [R.W.] in court through part of the trial."

25

the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* A hypothetically correct jury charge in this case would state that Citizen is guilty of the charged offense if he: (1) with the intent to arouse or gratify his sexual desire, (2) touched the genitals of R.W., (3) who was then a child younger than 17 years of age. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (c)(1). For purposes of proving indecency with a child, touching may be through clothing. *Id.* § 21.11(c)(1). A jury may infer intent "from any facts which tend to prove its existence,

26

including the acts, words, and conduct of the accused . . . ." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Citizen's sufficiency argument is, in its entirety, as follows:

Appellant here incorporates by reference the discussion of facts and issues placed before the jury from the Statement of Facts, and from Issues III through X, above. Because much of the evidence given by [Duchamp, Blitch, and Fontnett] was to any extent, obtained or used at trial, in violation of Appellant's Fifth and Sixth Amendment rights under the Constitution of the United States of America, as previously discussed in this Brief, it must be excluded from consideration as evidence supporting the verdict.

When exclusion of this 'evidence' is combined with exclusion of parts of R.W.'s testimony which are no longer reasonable or credible, []such as that Appellant used a cupped hand to touch her vaginal area for two seconds through layers of clothing, and that this was done by a grown man with 3 children of his own, and for sexual gratification,[] then the evidence will be legally insufficient to support the verdict. Let Justice not be as quick as a child's imagination!

This argument betrays a misunderstanding of the applicable law. We do not, as Citizen suggests, exclude evidence from our sufficiency analysis merely because it has been objected to; instead, when reviewing sufficiency of the evidence supporting a conviction, we must consider "all evidence in the trial-court record, whether admissible or inadmissible." *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

Reviewing the evidence in the light most favorable to the verdict, *see Hacker*, 389 S.W.3d at 865, we find that a reasonable juror could have found the elements of the offense beyond a reasonable doubt. A conviction for indecency with a child is supportable on the uncorroborated testimony of the victim. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West, Westlaw through 2013 3d C.S.). R.W. testified that, when she was twelve years old, Citizen called her into JaLeisa's bedroom and "took the . . . left hand off his hip and cupped it and went upwards on my vaginal area . . . ." She stated that the touching lasted "[a]t least two seconds," that it made her uncomfortable, and that she did not think it was

27

an accident.  She stated that, prior to the touching, Citizen had said "First, you got to give me a kiss," and she agreed with the prosecutor that Citizen wanted to "gratify himself sexually."  R.W. further testified that Citizen threatened her and her family if she told anyone about what happened.  Taken together, this evidence is sufficient to sustain the jury's verdict under the applicable law.  Citizen's eleventh issue is overruled.

### III. CONCLUSION

Having overruled Citizen's eleven issues, we affirm the trial court's judgment.


DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).W


Delivered and filed the
5th day of February, 2015.

28